IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BOARDAKAN RESTAURANT LLC, et al.,

                    Plaintiffs,

        v.                                                          CIVIL ACTION
                                                                    NO. 11-5676
ATLANTIC PIER
ASSOCIATES, LLC., et al.,

                    Defendants.

## OPINION

**Slomsky, J.**                                                      **July 17, 2104**

## I.    BACKGROUND

At the heart of this case lies a dispute over a lease.  Plaintiffs Boardakan Restaurant, LLC

and Oceanental Restaurant, LLC ("Plaintiffs") own two upscale restaurants at "The Pier at

Ceasar's" ("The Pier") in Atlantic City, New Jersey.  Plaintiffs lease space from Defendant

Atlantic Pier Associates, LLC ("APA"), a limited liability company owned and operated by the

Gordon Group Defendants[1] and the Taubman Defendants.[2]  Plaintiffs originally entered into

lease agreements (the "Lease Agreement" or "Agreement")[3] with Defendants in 2004 when The

Pier was still undergoing construction with a scheduled opening date of March 2006.  Under the

---

[1] The "Gordon Group Defendants" are Defendants Gordon Group Holdings, LLC, Pier
  Developers, Inc., Sheldon Gordon, Scott Gordon, and Peter Fine.

[2] The "Taubman Defendants" are Defendants Taubman Centers, Inc., Taubman Realty Group,
  LP, Taubman Realty Group The Pier, LLC, and the Taubman Company, LLC.

[3] The lease agreements have nearly identical terms.  Accordingly, for purposes of this Opinion,
  the Court will refer to the lease agreements as one "Lease Agreement" or "Agreement."

terms of the Lease Agreement, if The Pier did not open on time, then Plaintiffs' lease would automatically become null and void.  (Doc. No. 13 at ¶ 51.)

In 2004, two other upscale restaurants, RumJungle and English Is Italian, also entered into lease agreements with Defendants.  It soon became apparent that The Pier would open later than scheduled.  Knowing they would be able to walk away from the project, Plaintiffs sent a letter to Defendants asking for further assurances.  (Id. at ¶85.)  Specifically, Plaintiffs asked if RumJungle and English Is Italian maintained binding leases with Defendants.  Plaintiffs then met with Defendant Peter Fine, who informed them that RumJungle and English Is Italian would "definitely" be opening at The Pier, when in fact they had both already terminated their leases.  (Id. at ¶ 103.)  Plaintiffs allege that Defendants sent emails, letters, and press releases, all confirming the participation of RumJungle and English Is Italian.  (Id. at ¶ ¶ 96, 99, 109.)  Plaintiffs argue that Defendants conspired to keep them in the dark, knowing that they would not continue with the project without the other restaurants on board.   On February 22, 2006, one month before their lease was set to expire, Plaintiffs entered into amended lease agreements with Defendants, investing substantial sums of money "to construct, improve, open and operate" their restaurants at The Pier.  (Id. at ¶ 114.)  Plaintiffs claim that they would not have made these investments but for Defendants' misrepresentations.  (Id. at ¶ 96)

## II.      RELEVANT PROCEDURAL HISTORY

This litigation has a protracted procedural history, but the pertinent facts for this Opinion are as follows:

Plaintiffs brought suit against Defendants alleging fraud, negligent misrepresentation, promissory estoppel, conspiracy, and alter ego.  (Doc. No. 13.)  As relief for their fraud claim, Plaintiffs seek, among other remedies, rescission of the February 22, 2006 amendments to the

Lease Agreement (the "Amendment"),[4] and ask that Defendants return Plaintiffs to the status quo that existed immediately before the Amendment.  (Doc. No. 13 at 59.)  In effect, Plaintiffs wish to void the Lease Agreement and recover the roughly ten million dollars they expended "to construct, improve, open and operate" their restaurants at The Pier.  (Id. at ¶ 114.)

On May 29, 2014, Taubman Defendants filed a Motion for Determination of Measure of Damages Under the "Direct Product" Rule.  (Doc. No. 125.)  The "direct product" rule is a rule that can affect the measure of damages when rescission is sought as a remedy.  Defendant Taubman argues that if Plaintiffs prevail on their rescission claim, then under the "direct product" rule, any monetary award Plaintiffs receive should be reduced by any "income and profits" they obtained as a "direct product" of the Lease Agreement.[5]  (Id. at 9.)  More specifically, Taubman Defendants argue that if Plaintiffs' prevail, their damages award should be

---

[4] Like the lease agreements, the amendments have nearly identical terms.  Accordingly, for purposes of this Opinion, the Court will refer to the amendments as one "Amendment."

[5] The parties have not defined the words "income" and "profit" as they apply to this case.  From both an accounting and legal perspective, these terms have several meanings.  In Black's Law Dictionary, for example, "ordinary income" is defined for business-tax purposes as "earnings from the normal operations or activities of a business."  Black's Law Dictionary 881 (10th ed. 2014).  "Profit" is defined as "the excess of revenues over expenditures in a business transaction." Id. at 1404.  The Court is using these definitions for purposes of the analysis here, even though other definitions of these terms are set forth in Black's Law Dictionary.

Because the parties have not defined the words "income" and "profit," the Court will assume that "income" includes all earnings from the normal operation of Plaintiffs' restaurants at The Pier.  In this context, earnings are equivalent to gross sales of a business.  The term "gross sales," however, is defined specifically in the Lease Agreement.  See infra, Section III (citing Doc. No. 134-2 at 6-7).  Because the Lease Agreement provides that Defendants may be entitled to a portion of Plaintiffs' gross sales as part of the calculation of the rent to be paid by Plaintiffs, which would be paid to Defendants if rescission is a remedy here, the distribution of Plaintiffs' "income" or earnings for purposes of rescission is already covered by the terms of the lease.  See id. (citing Doc. No. 134-2 at 3-4, 6-7.)  Allowing Defendants to recover an additional amount of Plaintiffs' "income" under the "direct product" rule, even if it applied here, would amount to an impermissible double recovery.  Insofar as "profit" is concerned, the Court has concluded in this case that Plaintiffs' "profit" is not a "direct product" of the lease for the reasons set forth infra, Section IV.

reduced by any income or profits Plaintiffs received from the operation of their restaurants on the leased premises.  (Id. at 9-10.)

On June 17, 2014, Plaintiffs filed a Response, arguing that the profits and income they earned from operating the restaurants should not be factored into a calculation of rescission damages because they are not the "direct product" of the parties' Lease Agreement, but rather the product of Plaintiffs' own investment and work.  (Doc. No. 132 at 5.)  Plaintiffs argue that a "direct product" is "defined as that which is derived from the ownership or possession of the property without the intervention of an independent transaction by the possessor and is distinguished from the profits made by the holder of the subject matter through its use."  (Id. at 3) (emphasis in original).  The issue involving the interpretation of the "direct product" rule as applied to this case is now ripe for disposition.[6]

## III.    THE LEASE AGREEMENT

In order to determine what constitutes a "direct product" of a transaction, it is first necessary to understand the underlying transaction.  In addition, because rescission "amounts to the unmaking of a contract, and . . . is an abrogation of all rights and responsibilities of the parties towards each other from the inception of the contract," it is necessary to understand the expectations of both parties upon entering into the Lease Agreement.  Keenheel v. Com., Pennsylvania Sec. Comm'n, 579 A.2d 1358, 1361 (Pa. Commw. Ct. 1990) (citing Metropolitan

---

[6]  In rendering this Opinion, the Court has considered the Amended Complaint (Doc. No. 13), Taubman Defendants' Motion for Determination of Measure of Damages (Doc. No. 125), Plaintiffs' Response (Doc. No. 132), Taubman Defendants' Reply (Doc. No. 134), relevant portions of the parties' lease agreements (Doc. No. 134-2, 134-3), and the arguments of counsel at the hearing held on July 1, 2014.  No liability has been established in this case to date and no inference of liability should be inferred from this Opinion.  The Court is issuing this Opinion at the behest of the parties in order to expedite and streamline the discovery process.

Property and Liability Insurance Co. v. Pennsylvania Insurance Commissioner, 509 A.2d 1346, 1348 (Pa. Commw. Ct. 1986), aff'd, 535 A.2d 588 (Pa. 1987)).

In order to determine the parties' expectations, the Court turns to the language of the Lease Agreement.  The parties entered into the Lease Agreement on March 12, 2004.  Under the Agreement, Defendant Pier Developers, Inc. ("Pier Developers") is listed as the landlord, while Plaintiffs Boardakan Restaurant, LLC and Oceanental Restaurant, LLC are listed as the tenants.[7]

It is clear that both parties intended the leased space to be used solely for the operation of Plaintiffs' restaurants.  The Agreement states:

> 1.11   Permitted Use:   Subject to the provisions of Section 8.1 hereof, a Buddakan restaurant comparable to the restaurant currently operating as of the date of this Lease in Philadelphia, Pennsylvania.[8]
>
> ***
>
> Section 8.1.  Use of Premises
>         The Premises shall be occupied and used by Tenant solely for the Permitted Use, and Tenant shall not use or permit or suffer the use of the Premises for any other business purpose.

(Doc. No. 134-2 at 4, 8-9.)

Further, each party agreed to undertake certain construction in order to build restaurants on the property.  Under Article III and Exhibit C of the Agreement, the construction work was divided into "Tenant's Work" and "Landlord's Work," respectively.  Pier Developers agreed, at their own expense, to construct the building's shell, including the "common area," "roof,"

---

[7] In January of 2005, Defendant APA stepped into Pier Developers' shoes and assumed responsibility for lease administration and lease enforcement at the Pier.  (Doc. No. 13 at 20.)  For purposes of this Opinion, the Court will use the text of the Lease Agreement and refer to Pier Developers as the Landlord.

[8] In Plaintiff Oceanental Restaurant's lease, this section describes the permitted use as a "Continental restaurant comparable to the restaurant currently operating as of the date of this Lease in Philadelphia, PA."  (Doc. No. 134-3 at 4.)

"exterior walls," "ceilings," "floor slab," "partitions and doors," and install certain utilities.  (Id., Ex. C, at 11-12.)  Plaintiffs agreed to build out, at their own expense, the interior of the restaurants including the "storefront and signing, interior partitions, all interior finishes, visual merchandising and fixturing, furnishings and equipment, lighting, plumbing, HVAC, [and] mechanical and electrical systems interface."  (Id. at 15.)  In addition, the parties wrote in a Construction Allowance, where Pier Developers would cover a portion of Plaintiffs' work:

> Section 24.23.  Construction Allowance
>
> In consideration of Tenant entering into this Lease and building out its store in accordance with Tenant's plans described in Article 3 hereof and to pay a portion of the cost of constructing or improving qualified long-term real property to be used in Tenant's business, Landlord shall pay to Tenant the lesser of (i) Three Hundred Dollars ($300.00) per square foot of the Premises, or (ii) the actual costs of Tenant's Work (the "Construction Allowance").

(Id. at 10.)

From these provisions it appears that the work done by each party was commensurate with their use of the premises.  As landlord and owner of the building, Pier Developers agreed to construct the building as well as all exterior and common areas.  Plaintiffs, as temporary residents, agreed to construct the space's interior.  Realizing that some of Plaintiffs' interior construction would constitute long-term improvements to the property, Defendant agreed to pay to Plaintiffs a Construction Allowance.[9]

The parties also included in the Lease Agreement provisions concerning Plaintiffs' rent obligation, taking into account that Plaintiffs would be using the property to operate restaurants.

---

[9] Under the Agreement, Pier Developers was to "deliver" the property to Plaintiffs after it had completed a substantial amount of the Landlord's Work.  (Doc. No. 13-2 at 7.)  According to the Complaint, delivery and Tenant's Work occurred after the parties signed the Amendment. Accordingly, in seeking rescission of the Amendment, Plaintiffs' are seeking a return of the money they spent on their required Tenant's Work.

Plaintiffs were required to pay Pier Developers both a set minimum monthly rent as well as a

fluctuating percentage of the gross sales of Plaintiffs' restaurants, the "percentage rent." The rent

terms are set forth as follows:

ARTICLE I
LEASE TERMS AND EXHIBITS

***

    1.4    <u>Minimum Annual Rent</u>:

        (i)    $35.00 per square foot of Store Floor Area, or Three Hundred Seventeen Thousand Eight Hundred and 00/100 Dollars ($317,800.00) per annum, payable in equal monthly installments, in advance upon the first day of each and every month commencing upon the Commencement Date and continuing thereafter through and including the last month of the first (1st) Lease Year of the Lease Term; and

        (ii)    Commencing with the second (2nd) Lease Year, the Minimum Annual Rent shall be increased each year of the Lease Term by the increase in the Consumer Price Index (as defined in Section 14.1 below) over the Consumer Price Index for the prior Lease Year.

***

    1.6    <u>Percentage Rent</u>:  The amount by which nine and one-half (9.5%) percent of Gross Sales (hereinafter defined) during each Lease Year or Partial Lease Year exceeds the Minimum Annual Rent for such period.

    1.7    <u>Threshold Percentage</u>:  Nine and one-half (9.5%) percent.

***

ARTICLE IV
RENT

<u>Section 4.1.</u>  <u>Minimum Annual Rent</u>

    Tenant covenants and agrees to pay to Landlord, without notice or demand, at Landlord's address for notice, . . . as rent for

7

the Premises, the Minimum Annual Rent as set forth in Section 1.3 [sic] of the Lease.

\*\*\*

Section 4.3.  Percentage Rent

\*\*\*

Percentage Rent shall become due and payable in each Lease Year on the fifteenth (15th) day of the month immediately following the month during which the Threshold Percentage of Gross Sales exceed the Minimum Annual Rent payable by Tenant for such Lease Year, and thereafter shall be paid monthly on all additional Gross Sales made during the remainder of such Lease Year, such payments to be made concurrently with the submission by Tenant to Landlord of the written statement of monthly Gross Sales as provided for herein.

\*\*\*

Section 4.4.  Gross Sales Defined

As used herein, "Gross Sales" means the sale prices of all food, beverages, liquor, goods, wares and merchandise sold and the charges for all services performed by Tenant or any other person or entity in, at, or from the Premises for cash, credit or otherwise, without reserve or deduction for uncollected amounts, including but not limited to sales and services (i) where the orders originate in, at or from the Premises, regardless from whence delivery or performance is made, (ii) pursuant to mail, telephone, telegraph or otherwise received or filled at the Premises, (iii) resulting from transactions originating in, at or from the Premises, and deposits not refunded to customers.  Excluded from Gross Sales shall be: (i) exchanges of merchandise between Tenant's restaurants or stores made only for the convenient operation of Tenant's business and not to consummate a sale made in, at or from the Premises, (ii) returns to manufacturers or suppliers, (iii) refunds to customers (but only to the extent included in Gross Sales), (iv) sales of fixtures, machinery and equipment after use in Tenant's business in the Premises, (v) sales, excise or similar tax imposed by governmental authority and collected from customers and paid out by Tenant, (vi) loans or advances from suppliers, discount program sponsors, service providers or others, (vii) tips paid by customers for the benefit of Tenant's staff, and (viii) the amount of any discounts or allowances for special promotions or given for discount cards, certificates or coupons of any nature, or goods, products or merchandise provided on a complementary or non-

8

chargeable basis under any promotion, arrangement or program. No other taxes shall be deducted from Gross Sales.

(Id. at 3-4, 6-7.)

In sum, the rent provisions include two forms of consideration.  First, at a minimum, Plaintiffs were required to pay Pier Developers a fixed monthly rent.  This rent payment is not tied to the operation of the business in any way and is consideration for Plaintiffs' use of the premises.  Second, the parties chose to add a rental charge for the fluctuating payment of 9.5% of Plaintiffs' gross sales.  This rent is tied to the operation of Plaintiffs' business, and is consideration for the portion of Plaintiffs' sales that are attributable to the use of the premises by Plaintiffs to generate income.  Indeed, under the heading "Gross Sales Defined," the parties agree that the term 'gross sales' only encompasses sales that have some connection with the premises. (Id. at 7) (Gross sales include "where the orders originate in, at or from the Premises. . . pursuant to mail, telephone, telegraph or otherwise received or filled at the Premises. . . resulting from transactions originating in, at or from the Premises" but do not include "exchanges of merchandise between Tenant's restaurants or stores made only for the convenient operation of Tenant's business and not to consummate a sale made in, at or from the Premises" or "returns to manufacturers or suppliers" or "sales of fixtures, machinery and equipment after use in Tenant's business in the Premises," etc.)  Thus, as noted, the term "gross sales" is defined as the sales attributable to Plaintiffs' use of the premises to generate income.  By receiving 9.5% of Plaintiffs' gross sales, Defendants would be receiving 9.5% of Plaintiffs' income, an amount in addition to the payment of the Minimum Annual Rent.

## IV.    STANDARD FOR RESCISSION AND THE "DIRECT PRODUCT" RULE

Here, Plaintiffs seek rescission of the 2006 Amendment to the Lease Agreement, including a return of the money they invested in their required Tenant's Work, since all of their

9

construction work apparently occurred after signing the Amendment.  Plaintiffs acknowledge that if rescission is permitted, Defendants are entitled to a return of the premises as well as all rent, including the percentage rent, for the period of Plaintiffs' occupancy.  (Doc. No. 132 at 4.)

The purpose of rescission, which is an equitable remedy, is to return the parties as nearly as possible to their original position regarding the subject matter of the contract.  Keenheel, 579 A.2d at 1361 (citing Sullivan v. Allegheny Ford Truck Sales, 423 A.2d 1292 (Pa. Super. Ct. 1980)).  "One who wishes to rescind a contract must restore or tender a return of the property or security which was the subject matter of the contract."  Id.  (citing Fowler v. Meadow Brook Water Co., 57 A. 959 (Pa. 1904).  According to the Restatement (Third) of Restitution and Unjust Enrichment § 54, rescission requires:

> [A] mutual restoration and accounting in which each party:
>
> (a) restores property received from the other, to the extent such restoration is feasible,
>
> (b) accounts for additional benefits obtained at the expense of the other as a result of the transaction and its subsequent avoidance, as necessary to prevent unjust enrichment, and
>
> (c) compensates the other for loss from related expenditure as justice may require.

Restatement (Third) of Restitution and Unjust Enrichment § 54.

In regard to rescission, the "direct product" rule was formulated to prevent unjust enrichment when one party has used or converted the property of another party.  The rule is included in the Restatement (First) of Restitution § 157 and provides as follows:

> (1) A person under a duty to another to make restitution of property received by him or of its value is under a duty
>
> (a) to account for the direct product of the subject matter received while in his possession, and

      (b) to pay such additional amount as compensation for the use of the subject matter as will be just to both parties in view of the fault, if any, of either or both of them.

      (2) The rule stated in Subsection (1) is applicable to an action brought solely to recover the income or value of the use of the subject matter, or interest upon the amount of its value.

Restatement (First) of Restitution § 157.

      The comments to the "direct product" rule explain that:

> where a person has received possession of . . . land. . . whether or not the . . . acquisition  . . . was wrongful  . . . the person entitled [to the land] is fully restored to his original position only if compensation is made for the use of the subject matter for the period during which he was deprived.  This compensation will vary according to the subject matter and the respective faults of the parties. . . . If he was an innocent converter, he should fully compensate the other, but, except for the "direct product," should be entitled to incidental profits made from the use.

(Id., cmt a.)  Comment (b) explains that the phrase "direct product" "means that which is derived from the ownership or possession of the property without the intervention of an independent transaction by the possessor."  (Id., cmt b.)

## V.    PLAINTIFFS' RESCISSION DAMAGES, IF ANY, ARE NOT REQUIRED TO BE OFF-SET BY PLAINTIFFS' INCOME AND PROFIT

      Defendants argue here that if Plaintiffs are to receive a return of their Tenant's Work investment, that return must be off-set by their income and profits.  In other words, Defendants argue that Plaintiffs' income and profits are solely the result of their possession of the leased premises, and specifically Tenant's Work, which created the restaurants' interior.  To highlight their argument, Defendants concede that had Plaintiffs invested their income and profits in some other venture and made additional income and profits, the latter return on their investment would not be a "direct product" under the lease agreement, but a return made by the intervention of an independent transaction.

11

The question of whether business income and profits from the operation of a restaurant are the "direct product" of a commercial lease agreement appears to be a question of first impression in this District, but guidance can be found in Randall v. Loftsgaarden, 478 U.S. 647 (1986), and a more recent case from the District of Nevada, G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc., No. 04-01199, 2008 WL 5083700 (D. Nev. Nov. 25, 2008).

In Randall, the Supreme Court applied the "direct product" rule to interpret statutory provisions of the Securities Act of 1933. Randall, 478 U.S. at 657. The plaintiffs in Randall were successful in their securities fraud claim against the defendants. Under the Act, the plaintiffs were entitled to rescission and "to recover the consideration paid for [the] security with interest thereon, less the amount of any income received thereon. . . ." Id. at 651 (citing 15 U.S.C. § 77l(2)). At issue was whether tax benefits the plaintiffs received from their stock ownership constituted "income received" under the Act. Id. at 657. Noting the sparse legislative history on the issue, the court turned to the common law "direct product" rule and held "that tax benefits, because they accrue only if the tax deductions or credits the investment throws off are combined with income generated by the investor or taxes owed on such income, would in all likelihood not have been deemed a 'direct product' of the security at common law." Id. at 658-59 (emphasis in original.)

Similarly, in G.K. Las Vegas, 2008 WL 5083700, the Nevada District Court found that when deciding to grant rescission of a sales contract, any profits received through the subsequent use of sale proceeds with third-parties would not be covered by the "direct product" rule. Id. at *7. In G.K. Las Vegas, plaintiffs claimed that defendants fraudulently induced them to sell their partnership interest to defendants at a devalued price. After the fraudulently induced sale, plaintiffs received a profit when they invested the sale proceeds in a separate, successful venture.

Defendants sought discovery relating to the profit plaintiffs earned, arguing that under the "direct product" rule, such profit should be disgorged from plaintiffs' damages.  In overturning the Magistrate Judge's grant of discovery on this issue based on the Judge's interpretation of the "direct product" rule, the district court clarified that the "direct product" rule does not contemplate disgorging profits received from separate transactions, even if the plaintiff would not have received such profits "but for" the rescinded transaction:

> The Magistrate Judge in claiming, "[b]ut for that agreement, Plaintiffs would not have had $173,966,650 to invest in other assets from which they have possibly derived substantial income or profits," has broadened the scope of "benefit conferred" and "benefit derived" to include all collateral benefits of the contract for Plaintiffs, including those that are unintended and unanticipated by Defendants. A "but for" analysis greatly expands the underpinnings of the Direct Product Rule and is contrary to the law of rescission.

Id.

The court also alluded to the principle of unjust enrichment as a reason why defendants were not entitled to a credit for the profits plaintiffs subsequently earned from investing with a third party.  With the understanding that rescission would only occur if the plaintiffs were successful on their claim of fraud against the defendants, the court noted:

> Furthermore, if rescission is ultimately granted because a determination of fraud is made it would be paradoxical to require the victim [the plaintiffs] to compensate the wrongdoer for a merely tangential benefit of the wrong.

Id. at *6.

Finally, the court reasoned that the act of restoring parties to their original position should be guided by the terms of consideration contemplated by the parties at the time of the contract, not by the subsequent good fortune of one of the parties:

> Restoration of the parties to their initial status cannot mean restoration in a broad metaphysical sense, but rather only

13

restoration with regard to what each party provided in terms of
consideration under the contract and legal interest thereon.

Id.

Defendants in this case have unrealistically simplified the issue and their position is not

availing.  First, this Court agrees with the court in <u>G.K. Las Vegas</u>, and finds that restoration of

the parties to their original positions should account for "what each party provided in terms of

consideration under the contract." <u>G.K. Las Vegas</u>, at *6.  Here, the Lease Agreement

contemplates the use of the leased space as a restaurant, and the parties constructed a two-tiered

rent system as consideration for such use.  Under this system, Defendants were to receive a fixed

amount of rent each month or that amount plus a percentage of Plaintiffs' income if a threshold

amount was earned (the "percentage rent").[10]  An equitable rescission of the Lease Agreement

and Amendment would honor this consideration term and award Defendants all rent, including

percentage rent, for the period of Plaintiffs' occupancy.  As noted, Plaintiffs agree that

Defendants are entitled to this amount.  Allowing Defendants to be credited with an additional

amount of Plaintiffs' income would expand the scope of the Lease Agreement, may result in the

impermissible double recovery, and unjustly enrich Defendants.  <u>See</u> <u>footnote 5,</u> <u>supra</u>.  The

"direct product" rule was not devised to promote such inequitable results.

Next, Plaintiffs' profit in their investments at The Pier was sourced from a multitude of

factors, including not only the restaurants' design, but also, for example, the quality and

presentation of food and drink, the service provided by servers and host staff, public relations

and advertising efforts, as well as name recognition.  (<u>See</u> Doc. No. 132 at 9-10.)  Like the tax

benefits in <u>Randall</u>, Plaintiffs' profits do not result merely from the fact that Plaintiffs have

---

[10] As noted in footnote 4, <u>supra</u>, because the parties have not defined the words "income" or
"profit," the Court turned to Black's Law Dictionary and concluded that Plaintiffs' income is
equivalent to the Lease term "gross sales."

14

designed the interior of a building, but rather from a combination of a considerable number of separate actions taken by Plaintiffs which are not described in the Lease.  Because Plaintiffs' profits would not result without the intervention of these independent transactions on the part of Plaintiffs, they should not be considered a "direct product" of the Lease Agreement or Tenant's Work.

Like the profits earned by the plaintiffs in G.K. Las Vegas, Plaintiffs here could not have profited without their investment in separate, successful transactions such as the purchase of food, beverages, cooking supplies, tables, chairs, silverware, cleaning supplies and more all from outside vendors, as well as the hiring of competent front-of-house and back-of-house staff.  (See Doc. No. 132 at 10.)  To say that Plaintiffs' profit would not have resulted "but for" the Lease Agreement and Tenant's Work is again too broad a reading of the "direct product" rule.

Additionally, rescission would only occur if Plaintiffs are successful on their claim of fraud.  Similar to the court in G.K. Las Vegas, this Court would find it troubling if a defendant who engages in fraud should benefit from a plaintiff's independent and successful transactions with third-parties, which here would be the restaurants' customers and the separate business transactions listed above.  This is true especially given that the resulting profits are not connected to the allegedly fraudulent transaction.  Accordingly, under the "direct product" rule, Defendants are not entitled to an off-set for Plaintiffs' profits.

Defendants cite several cases to support the contention that they are entitled to the profits and income Plaintiffs earned from their independent transactions with customers.  These cases, however, are inapposite to the facts in the instant case.

First, Defendants rely on a decision from a court in Connecticut, Metcalfe v. Talarski, 213 Conn. 145 (1989).  Defendants claim in their memorandum of law that in Metcalfe, the court

held "that when the plaintiff rescinded his real estate purchase agreement . . . his damages were subject to a set-off for the rental value he collected from the property." (Doc. No. 134 at 7.) This is not an accurate description of the court's holding.  In <u>Metcalfe</u>, the plaintiff sought rescission of a real estate sales agreement after a commercial property was destroyed by a fire. 213 Conn. at 145.  This occurred before the parties closed on the real estate.  <u>Id.</u>  At the time the parties signed the sale agreement, defendants were renting part of the commercial property to a social club.  After the agreement was signed, defendants gave the plaintiff keys to the building, and somehow the plaintiff collected $1000 rent from the social club.  <u>Id.</u> at 148-149.  The court held that while the plaintiff was entitled to rescission, he was required to give defendants the rent money he received.  <u>Id.</u> at 155.  This ruling, however, was not based on the "direct product" rule. Rather, the plaintiff was simply not entitled to keep the rent money.  The plaintiff did not have an independent lease agreement with the social club.  The lease agreement was between the defendant and the social club, and, as such, the defendant was entitled to the rent.  <u>Metcalfe</u> has no bearing on the case at bar.

Defendants also cite <u>Emerald Invs., LLC v. Porter Bridge Loan Co.</u>, No. 05-1598, 2007 WL 1834507 (D. Conn. June 25, 2007), in which the District Court of Connecticut found that interest on loan payments constituted a "direct product" of the loan, and therefore must be accounted for when restoring the parties to their original positions.  In <u>Emerald Invs.</u>, plaintiffs sought rescission of two loans made to them by defendants on the theory that defendants committed fraud in connection with the loans.  <u>Id.</u> at *1.  A jury returned a verdict in plaintiffs' favor, but the district court found that under rescission, the plaintiffs were still required to pay defendants the outstanding amount due to defendants under the loan, plus interest.  <u>Id.</u> at *3.

16

Emerald Invs. stands for the proposition that interest on money constitutes a direct product "derived from . . . possession of the [money] without the intervention of an independent transaction by the possessor." Id. at *1.  This holding is in line with Randall and G.K. Las Vegas because in Emerald Invs., unlike the other cases, the plaintiffs did not engage in an independent action to earn interest on their loan.  Rather, the interest simply accrued as a direct result of the transaction.[11]

Here, Plaintiffs' profits are the result of several transactions, not simply the Lease Agreement or Tenant's Work.  Accordingly, they are not a direct product of the Lease Agreement, and if Plaintiffs are successful in their fraud claim, rescission will not require their damages award to be off-set by their profit.  Additionally, an off-set is not required for Plaintiffs' income because the parties already came to a consensus in the Lease Agreement as to the percentage of Plaintiffs' income that Defendants are owed.  Both parties agree that under

---

[11] Interestingly, after finding that interest constituted a "direct product" of a loan, the court in Emerald Invs. limited defendants' interest recovery:

> [T]he court agrees that [Defendant] Porter Bridge is entitled to some interest on the money it loaned the plaintiffs, but only on that portion of the money from which the plaintiffs benefitted.  Thus, it finds that [Defendant] Porter Bridge is only entitled to interest on the amount of money that the plaintiffs used to pay off other loans. . . .

Id. at *3 (emphasis added.)

It is unclear from the court's Opinion why it limited defendants' recovery to only the interest that plaintiffs later used to their benefit.  Perhaps the court was hesitant to award defendants who had engaged in fraud the full interest amount.  Whatever the reason, the underlying principle of Emerald Invs. remains the same.  When seeking rescission, a plaintiff must account for the "direct product" of a transaction, meaning any product derived solely from ownership or possession, without the intervention of an independent transaction.

rescission, Defendants are entitled to that percentage.  Crediting Defendants with more than their agreed-upon share of the income would create an unjust enrichment.

## VI.   CONCLUSION

For the foregoing reasons, the Court will deny the Taubman Defendants' Motion for Determination of Measure of Damages Under the "Direct Product" Rule.  (Doc. No. 125.)  An appropriate Order follows.