IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BOARDAKAN RESTAURANT LLC, et al., | |
| Plaintiffs, | CIVIL ACTION |
| v. | NO. 11-5676 |
| GORDON GROUP HOLDINGS, LLC, et al., | |
| Defendants. | |

## TABLE OF CONTENTS

I.   INTRODUCTION AND BACKGROUND ....................................................................1

II.  FINDINGS OF FACT.............................................................................................4

    A.    The Parties ............................................................................................4

        i.    Plaintiffs Boardakan Restaurant, LLC
            and Oceanental Restaurant, LLC ...............................................4

        ii.    Defendants Gordon Group Holdings, LLC, Pier Developers, Inc.,
            Sheldon Gordon, Scott Gordon, and Peter J. Fine .......................5

    B.    The Chodorow Organization.......................................................................6

    C.    The Initial Agreement Between Gordon Group Holdings
        and Caesar's Atlantic City Hotel and Casino ...............................................6

    D.    RumJungle and the Intent to Open at The Pier.............................................7

    E.    Boardakan and Oceanental Agree to Open Restaurants at The Pier;
        Leases are Signed to Open Buddakan and Continental ...............................8

    F.    Chodorow's RumJungle and English is Italian Leases Present
        Development Problems........................................................................11

    G.    The RumJungle Lease is Amended...........................................................12

    H.    In Late 2005 Landlord Gives Notice of Delivery of the Premises
        to the Chodorow Organization for Its Two Restaurants .........................13

i

**I.**      In Late 2005 Landlord Gives Notice of the Delivery of the Premises to the Starr Organization for Buddakan .........................................**15**

**J.**      The December 16, 2005 Letter .........................................**17**

**K.**      The Amended Leases .........................................**17**

**L.**      The February 9, 2006 Email and Request.........................................**19**

**M.**      The Two Chodorow Restaurants, RumJungle and English is Italian, Do Not Open .........................................**20**

**III.**    **CONCLUSIONS OF LAW** .........................................**21**

    **A.**      Plaintiffs Have Not Met Their Burden of Proving Fraudulent Inducement as Alleged in Count I .........................................**22**

         **i.**      Defendants Did Not Commit Fraud by Making Direct Misrepresentations .........................................**27**

         **ii.**      Defendants Did Not Commit Fraud by Nondisclosure .........................................**30**

         **iii.**      Defendants Did Not Commit Fraud by Concealment.........................................**32**

         **iv.**      On Each Theory of Fraud, Plaintiffs Have Not Proven Defendants' Fraudulent Intent.........................................**35**

         **v.**      On Each Theory of Fraud, Plaintiffs Have Not Proven Their Justifiable Reliance .........................................**35**

    **B.**      Although Parol Evidence is Not Barred in this Case, Plaintiffs Still Have Not Proven Fraud.........................................**38**

    **C.**      Plaintiffs Have Not Met Their Burden of Proving Negligent Misrepresentation as Alleged in Count II .........................................**42**

    **D.**      Plaintiffs Have Not Met Their Burden of Proving Promissory Estoppel as Alleged in Count IV.........................................**45**

**IV.**    **DAMAGES** .........................................**45**

**V.**     **CONCLUSION** .........................................**45**

<u>OPINION</u>

Slomsky, J.                                                    October 21, 2016

## I.    INTRODUCTION AND BACKGROUND

Plaintiffs Boardakan Restaurant, LLC and Oceanental Restaurant, LLC each owned an upscale restaurant at "The Pier at Caesar's" ("The Pier") in Atlantic City, New Jersey.  (Doc. No. 247-1 at 2.)  The restaurants are named Buddakan and Continental.  (<u>Id.</u>)  Plaintiffs are affiliates of the Starr Organization, of which Stephen Starr is the principal owner.  (<u>Id.</u>)  Plaintiffs originally leased space for the restaurants in 2004 from Pier Developers Inc., which obtained a ground lease from the owner of the property for the purpose of developing The Pier.[1]  (Ex. P-6.)  Pier Developers, Inc. was a corporation formed by Sheldon Gordon, the owner of Gordon Group Holdings.[2]  (Doc. No. 248 at 1-2.)  Gordon had successfully developed a high-end mall in Las Vegas, Nevada, known as the Forum at Caesar's and decided to do a similar project at The Pier at Caesar's in Atlantic City.  (<u>Id.</u>)

The Pier was scheduled to open in March 2006.  Under the terms of Plaintiffs' two leases, one for each restaurant, if The Pier did not open on time, the leases would automatically become null and void.  (Doc. No. 247-1 at 9-10.)  When the development of The Pier took longer than expected, the parties began to consider amendments to the leases.  (<u>Id.</u> at 26.)  In late 2005,

---

[1]  Pier Developers Inc. was replaced as the development company by Atlantic Pier Associates, LLC.  (Doc. No. 248 at 1-2.)  This latter company apparently was controlled by Sheldon Gordon and other Defendants who have since settled with Plaintiffs.  (<u>Id.</u>)  These Defendants have been referred to in this litigation as the "Taubman Group," which consisted of Taubman Centers, Inc., Taubman Realty Group, LP, Taubman Realty Group, The Pier, LLC, and Taubman Company, LLC.  The "Taubman Group" Defendants and Atlantic Pier Associates, LLC were dismissed from this case by stipulation on December 29, 2014.  (Doc. No. 198.)

[2]  The "Gordon Group" consists of Gordon Group Holdings, LLC, Pier Developers, Inc., Sheldon Gordon, Scott Gordon, and Peter Fine.  (Doc. No. 248 at 1-2.)  Scott Gordon and Peter Fine are employees of Gordon Group Holdings.  (<u>Id.</u>)  The "Gordon Group" Defendants are the only defendants remaining in this case.

the parties began negotiating the amendments.  (Id.)  On February 22, 2006, Plaintiffs signed the Amended Leases.  (Id. at 68.)  The Amended Leases covered the operation of a Buddakan restaurant ("Buddakan") and a Continental restaurant ("Continental") at The Pier in Atlantic City. (Id.)

During the development process, the Gordon Group Defendants reached out to other known restaurant groups about opening locations at The Pier, including one associated with Jeffrey Chodorow, a well-known restaurateur.  (Doc. No. 248 at 1-2.)  Ultimately, leases were negotiated by Chodorow and his representatives to open two upscale restaurants at The Pier, "RumJungle" and "English is Italian."  (Doc. No. 247-1 at 4-6.)  These restaurants were to be operated by the Chodorow Organization.  (Id.)  Chodorow executed the leases through companies he controlled, ACNC, LLC and ACREST, LLC.  (Id. at 4, 10.)  On June 20, 2004, Pier Developers, Inc. entered into a lease with ACNC, LLC for the planned opening of RumJungle at The Pier, and on March 31, 2005, Atlantic Pier Associates, LLC entered into a lease with ACREST, LLC for the planned opening of English is Italian.[3] (Exs. P-7, P-22.)

It soon became apparent that The Pier would open later than scheduled.  Knowing they would be able to walk away from the project under the terms of the original leases, Plaintiffs

---

[3]  The events in this case regarding the opening of restaurants at The Pier at Caesar's begin in or around 2004 and conclude in 2007.  During this time, Stephen Starr and the Starr Restaurant Organization were negotiating with the Gordon Group to open restaurants.  During the same time period, Jeffrey Chodorow and companies he controlled also were negotiating with the Gordon Group to open restaurants. (Doc. No. 248 at 4-6.)  Thus, both the Starr and Chodorow Organizations were negotiating and signing leases with the Gordon Group during overlapping time periods.  (Id.)  The litigation here demonstrated that the Starr and Chodorow Organizations were not always aware of the communications and negotiations each had with the Gordon Group on an individual basis.  Accordingly, in this Opinion, the factual findings will cover the status of each organization's interaction with the Gordon Group, albeit in separate sections of the Opinion.

asked for further assurances before signing Amended Leases.  (Doc. No. 247-1 at 26-27.)  In this case, Plaintiffs contend that they entered into the Amended Leases on February 22, 2006 based on the assurances they received from Defendants which in Plaintiffs' view misrepresented the true state of the participation of the Chodorow restaurants, RumJungle and English is Italian, at The Pier.  (Id.)  Plaintiffs claim that they would not have made the investments in Buddakan and Continental at The Pier but for Defendants' misrepresentations.  (Id.)  As a result, this litigation ensued.

On August 14, 2014, Plaintiffs filed a Second Amended Complaint against Atlantic Pier Associates, LLC, the Gordon Group, and the Taubman Group asserting various claims arising from the negotiations for the Buddakan and Continental restaurants.  (Doc. No. 147.)  As noted, these negotiations led to the execution of the Amended Leases at issue.  (Id.)  More specifically, Plaintiffs allege the following claims in their Second Amended Complaint against the remaining Gordon Group Defendants:   Count I—Fraudulent Inducement Based on Misrepresentation, Nondisclosure, and Concealment; Count II—Negligent Misrepresentation; Count III—Civil Conspiracy;[4] Count IV—Promissory Estoppel; and Count V—Alter Ego.[5]  (Id.)

---

[4]  In their Response in Opposition to Defendants' Motion for Summary Judgment, Plaintiffs stated that they "no longer intend[ed] to pursue a civil conspiracy claim."  (Doc. No. 209-3 at 77.)  Accordingly, the civil conspiracy claim asserted in Count III of the Second Amended Complaint was dismissed in an Order dated July 31, 2015.  (Doc. No. 220.)  The Court will make no further ruling on this claim, although Defendants make reference to it in their post-trial submission.  (Doc. No. 248.)

[5]  In Count V of the Second Amended Complaint, Plaintiffs assert a claim for "Alter Ego." (Doc. No. 147 at ¶¶ 167-71.)  "Alter Ego," though, is not a cause of action.  Rather, it is a theory of liability that permits a court to "pierce the corporate veil" and impose liability on a corporation's owners or on a subservient corporation.  See Black's Law Dictionary 94 (10th ed. 2014).  Therefore, if Plaintiffs do not prevail on their other claims, there is no basis for imposing alter ego liability upon any Gordon Group Defendant.

On December 29, 2014, this Court approved a stipulation dismissing Atlantic Pier Associates, LLC and the Taubman Group as Defendants in this case. (Doc. No. 198.) In the Order dated July 31, 2015, the Count III Civil Conspiracy claim was dismissed. (Doc. No. 220.)

From October 26, 2015 to November 3, 2015, a seven-day bench trial was held before this Court. Thereafter, Plaintiffs and Defendants submitted proposed Findings of Fact and Conclusions of Law. (Doc. Nos. 247, 248.) Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court will now find the facts specially and state its conclusions of law separately. Fed. R. Civ. P. 52(a)(1).

## II.    FINDINGS OF FACT

### A. The Parties

#### i.    Plaintiffs Boardakan Restaurant, LLC and Oceanental Restaurant, LLC

Buddakan and Continental at The Pier are two restaurants presently owned and operated by Boardakan Restaurant Partners, LLC, an affiliate of the Starr Restaurant Organization.[6] (Koch Tr., 11:11, Oct. 30, 2015.) Originally, Boardakan Restaurant Partners, LLC owned Buddakan at The Pier, and Oceanental Restaurant Partners, LLC owned Continental at The Pier. (Koch Tr., 14:1-15, Oct. 30, 2015.) However, the Oceanental lease was subsequently assigned to Boardakan Restaurant Partners, LLC. (Id.) Therefore, at the time this litigation began, Boardakan Restaurant Partners, LLC owned both the Buddakan and Continental restaurants located at The Pier. (Id.) Stephen Starr is the principal owner of the Starr Restaurant Organization, Buddakan and Continental. (Doc. No. 247-1 at 2.) David Robkin is a member of the Board of Directors of the Starr Restaurant Organization. (Robkin Tr., 4:22, Oct. 27, 2015.)

---

[6] Plaintiffs refer to themselves in the caption of this case as "Boardakan Restaurant, LLC, trading as Boardakan Restaurant Partners, L.P.; and Oceanental Restaurant, LLC, trading as Oceanental Partners, L.P."

4

Robkin is also a 9% owner of the Starr Restaurant Organization, Buddakan, and Continental. (Robkin Tr., 122:17, Oct. 27, 2015.)   As of 2004, the Starr Organization had about ten restaurants operating.

> **ii.   Defendants Gordon Group Holdings, LLC, Pier Developers, Inc., Sheldon Gordon, Scott Gordon, and Peter J. Fine**

Sheldon Gordon was the sole owner of Gordon Group Holdings and its subsidiaries at all relevant times.   (Ex. P-166 at 23.)   Gordon is known in the industry as an experienced and successful developer who was in his mid-seventies when he entered into the transactions at issue here.   (Doc. No. 247-1 at 3.)   He maintained management control over all aspects of The Pier project, which included, for example, terminating or adding terms to a lease.   (Fine Tr., 7:21, Nov. 2, 2015.)

Scott Gordon is Sheldon Gordon's son.   He was an employee of Gordon Group Holdings. (Scott Gordon Tr., 3:24-4:3, Oct. 29, 2015.)   Peter Fine also was an employee of Gordon Group Holdings.   (Fine Tr., 6:17-25, Nov. 2, 2015.)   His primary responsibility was the leasing of projects.   (Fine Tr., 6:17-25, Nov. 2, 2015.)   Fine reported directly to Sheldon and Scott Gordon. (Fine Tr., 7:20-8:5, Nov. 2, 2015.)

Gordon Group Holdings was a development company that created concepts for the development of a real estate project, and then through subsidiaries and affiliated entities, engaged a general contractor to build the development.   (Ex. P-166 at 23.)   In the late 1980's, the Gordon Group developed a high-end mall in Las Vegas known as the "Forum at Caesar's." (Doc. No. 248 at 2.)   The Forum's success became the basis for the project at The Pier.   (Id.)

As noted previously, Pier Developers, Inc. was the development group founded by Sheldon Gordon to develop The Pier.   (Sheldon Gordon Tr., 148:19, Nov. 2, 2015.)   Scott

Gordon was named President of Pier Developers, Inc. and Peter Fine was named Director of Leasing.  (Sheldon Gordon Tr., 148:22, Nov. 2, 2015; Fine Tr., 6:24, Nov. 2, 2015.)  Sheldon Gordon still retained management control over Pier Developers, Inc. during the relevant time period in this case.  (Sheldon Gordon Tr., 151:19-20, Nov. 2, 2015.)

### B.  The Chodorow Organization

Events involving the agreements to open restaurants at The Pier by the Chodorow Organization are critical aspects of the litigation here.  Jeffrey Chodorow is the majority owner of China Grill Management, Inc.   (Faggen Tr., 160:10, Oct. 26, 2015.)   The Chodorow Organization is made up of Jeffery Chodorow, Neil Faggen, China Grill Management, ACNC, LLC, and ACREST, LLC.  (Faggen Tr., 6:18-8:6, Oct. 27, 2015.)  Neil Faggen is a principal and minority owner of China Grill Management.  (Faggen Tr., 160:5, Oct. 26, 2015.)  China Grill is a Florida Subchapter S Corporation that provides management and accounting services to affiliated hospitality companies.  (Faggen Tr., 163:24-164:1, Oct. 26, 2015.)  Through the efforts of Chodorow and Faggen, China Grill Management was the party responsible for opening the RumJungle and English is Italian restaurants at The Pier.

### C.  The Initial Agreement Between Gordon Group Holdings and Caesar's Atlantic City Hotel and Casino

In the early 2000's, Sheldon Gordon was approached by representatives of Caesar's Atlantic City Hotel and Casino and asked if he would develop a pier that would centralize the hotel, entertainment, retail, and casino complex.   (Sheldon Gordon Tr., 145:18-25, Nov. 2, 2015.)  In 2002, Gordon determined that he was able to develop a high-end mall on the pier adjacent to Caesar's on the boardwalk in Atlantic City, New Jersey.  (Sheldon Gordon Tr., 145:18-146:3, Nov. 2, 2015.)   The development project was given the name "The Pier at

Caesar's."  Gordon entered into a master lease with Caesar's to develop the property.  (Sheldon Gordon Tr., 146:3, Nov. 2, 2015.)  Gordon envisioned a three-floor complex, which housed a promenade on the third floor where patrons would be surrounded by dining and entertainment, and which included retail shops occupying the first two floors.  (Sheldon Gordon Tr., 147:15, Nov. 2, 2015.)  Gordon then set out to find restaurants and establishments to fill the spaces at The Pier.  (Sheldon Gordon Tr., 153:4-7, Nov. 2, 2015.)

### D.  RumJungle and the Intent to Open at The Pier

In 1999, a China Grill affiliate opened a RumJungle nightclub in Las Vegas at the Mandalay Bay Resort and Casino.  (Faggen Tr., 13:9, Oct. 26, 2015.)  At this location, RumJungle occupied 20,000 square feet of space and cost approximately $10.2 million to build. By May 1999, when the project was completed, RumJungle in Las Vegas had cost about $650 per square foot.  (Faggen Tr., 13:3-4, Oct. 26, 2015.)  RumJungle became a successful nightclub and a huge attraction for Mandalay Bay.  (Faggen Tr., 8:1-7, Oct. 26, 2015.)  Members of the Chodorow Organization were directly involved with the completion of the RumJungle Las Vegas project.  (Faggen Tr., 8:24, Oct. 26, 2015.)

Beginning in 2002, Sheldon Gordon sought out Jeffrey Chodorow to discuss bringing his restaurants to The Pier.  (Faggen Tr., 160:22-161:12, Oct. 26, 2015.)  Specifically, Gordon was interested in persuading Chodorow to open a RumJungle nightclub at the Pier.  (Sheldon Gordon Tr., 152:8-16, Nov. 2, 2015.)  Because the RumJungle nightclub was a successful addition to the Las Vegas strip, Gordon believed its success could be replicated at The Pier in Atlantic City. (Id.)

On July 26, 2002, the Gordon Group sent Chodorow a letter of intent for RumJungle's space at The Pier.  (Ex. P-1.)  The letter proposed a 10-year lease covering about 18,000 square

7

feet of space.  (<u>Id.</u> at 2)  It also provided for a $7.2 million allowance to build the nightclub.  (<u>Id.</u>)
In order to pay for the construction of the RumJungle space, the Gordon Group needed to find
investors.  (Sheldon Gordon Tr., 156:4-25, Nov. 2, 2015.)  Without investors, the nightclub
would not open at The Pier.  (<u>Id.</u>)

### E.  Boardakan and Oceanental Agree to Open Restaurants at The Pier; Leases are Signed to Open Buddakan and Continental

During the time that Sheldon Gordon and his representatives were negotiating with the
Chodorow Group, they were also negotiating with Stephen Starr.  (Sheldon Gordon Tr., 173:7-
14, Nov. 2, 2015.)  They discussed bringing Starr restaurants to The Pier.  (Sheldon Gordon Tr.,
167:12-17, 174:11, 276:24, Nov. 2, 2015.)  Gordon told Starr that RumJungle and another
Chodorow concept, English is Italian, were going to take space at The Pier.  (Sheldon Gordon
Tr., 173:19-21, Nov. 2, 2015.)  Prior to leasing space at The Pier, Starr reached out on two
occasions to Neil Faggen of the Chodorow Group to discuss their project.  (Faggen Tr., 183:11-
18, Oct. 26, 2015.)  Faggen told Starr that RumJungle had a lease, but that construction plans and
a budget had not yet been finalized.  (Faggen Tr., 185:2-7, Oct. 26, 2015.)  Faggen confirmed
that these preconditions had to be met before RumJungle was obligated to go forward under the
terms of the lease. [7]  (Faggen Tr., 185:25, Oct. 26, 2015.)

Sheldon Gordon met with Stephen Starr once regarding RumJungle.  The meeting
occurred in 2004.  At no other time did the parties meet to discuss RumJungle's opening at The
Pier.  (Sheldon Gordon Tr., 228:21, Nov. 2, 2015.)  On March 12, 2004, Pier Developers, Inc.
entered into a written lease with the Starr Organization for the planned operation of a Buddakan

---

[7] Faggen specifically said at trial that "[h]e asked me if I had a lease, and, you know—so I said,
  yea, I have a lease, but it has a lot of conditions."  (Faggen Tr., 187:3-5, Oct. 26, 2015.)

restaurant at The Pier.  (Ex. P-5.)  Also on March 12, 2004, Pier Developers, Inc. entered into a written lease with Oceanental for the planned operation of a Continental restaurant at The Pier. (Ex. P-6.)  Both the Continental and Buddakan leases were signed before RumJungle had entered into its lease with Gordon Group Holdings, although based upon Faggen's testimony, the Chodorow Organization had the RumJungle lease in hand.  (Faggen Tr., 187:3-5, Oct. 26, 2015.)

More specifically, Plaintiffs' two original leases did not reference RumJungle, English is Italian, or any other Chodorow Organization restaurant concept.  (Exs. P-5, P-6.)  Additionally, the leases do not contain any provision which assures the tenants of the presence of any other specific tenant at The Pier.  (Id.)  As such, there is no reference in either lease to any required participation of RumJungle or English is Italian at The Pier.  (Id.)  The leases do contain an integration clause, which states: "[t]here are no representations, covenants, warranties, promises, agreements, conditions or undertakings, oral or written, between Landlord and Tenant other than herein set forth."  (Exs. P-5 at § 24.3, P-6 at § 24.3.)  As noted, Plaintiffs signed their leases before the RumJungle lease was signed.[8]

According to the Buddakan and Continental leases, Pier Developers, Inc. was required to construct the shell of the restaurants in accordance with plan specifications set forth in the leases.[9]  (Exs. P-5 at § 3.1, P-6 at § 3.1.)  After the shell was completed, the landlord was

---

[8] On July 20, 2004, the RumJungle lease was entered into by Pier Developers, Inc. and ACNC, LLC.  This lease was signed more than four months after the Buddakan and Continental leases were executed.  (Ex. P-7.)  On March 31, 2005, Atlantic Pier Associates, LLC entered into a lease with ACREST, LLC for the planned operation of the English is Italian restaurant at The Pier.  (Ex. P-22.)  This lease was executed more than a year after the Buddakan and Continental leases were signed.  (Id.)

[9] The clause reads: "Landlord shall at its expense construct the Premises in substantial accordance with plans and specifications prepared or to be prepared by Landlord's architect,

required to deliver the premises to the tenants.  (Id.)  Following delivery, the tenants would then

begin the "Tenant's Work" on the interior of the restaurants.[10]  (Id.)  The restaurants had thirty

(30) days to submit their final construction plans and a maximum of one hundred and eighty

(180) days to complete their work to be ready by the "Commencement Date."[11]  The leases state

that if the landlord failed to deliver the premises and have a Commencement Date within two (2)

years after the March 12, 2004 execution of the Buddakan and Continental leases, the leases

automatically would become null and void.[12]  After the Commencement Date, the Buddakan and

---

incorporating in such construction all work described in Exhibit "C" hereto as being required of Landlord (hereinafter "Landlord's Work")."  (Exs. P-5 at § 3.1, P-6 at § 3.1).

[10] The Tenant's Work clause states:

> Tenant shall complete Tenant's Work by the Required Completion Date (as defined in Section 1.3 hereof).  Landlord shall give Tenant five (5) days prior written notice of the "Delivery Date," such Delivery Date being the date of which Landlord shall certify in writing to Tenant that Landlord's Work in the Premises has been substantially completed in accordance with the requirements therefor and that the Premises are available for the commencement of Tenant's Work subject to the requirements of the Lease . . .

(Exs. P-5 at § 3.3, P-6 at § 3.3.)

[11] (Id.)  The clause entitled "Commencement Date" reads as follows: "Commencement Date: The earlier of (i) one hundred and eighty (180) days following the Delivery Date (as defined in Section 3.3 hereof), which date is hereinafter called the 'Required Completion Date,' or (ii) the day on which Tenant opens for business."  (Exs. P-5 at § 1.3, P-6 at § 1.3.)

[12] The term covering a delay in delivery is as follows:

> . . . in the event that the Commencement Date shall not have occurred within two (2) years after the effective date of this Lease . . . then this Lease shall automatically become null and void and both parties hereto shall be relieved of all obligations hereunder, in which event each party will, at the other's request, execute an instrument in recordable form containing a release and surrender of all right, title and interest in and to this Lease.

(Exs. P-5 at § 24.20, P-6 at § 24.20.)

10

Continental leases initially provided that Plaintiffs would be required to pay a minimum annual rent for Buddakan, not including adjustments, of $317,800 and a minimum annual rent for Continental, not including adjustments, of $289,205.  (Exs. P-5 at § 1.4, P-6 at § 1.4.)

### F.  Chodorow's RumJungle and English is Italian Leases Present Development Problems

As noted, on July 20, 2004, Pier Developers, Inc. and ACNC, LLC, a Chodorow entity, entered into the lease for the RumJungle nightclub.  (Ex. P-7.)  The lease provided that the landlord was required to construct the shell of the premises by February 15, 2005.  (Ex. P-7 at § 3.1.)  Thereafter, the tenant had six months to build the space from the date on which the landlord completed its work.  (Id. at § 3.3.)

The lease required that other conditions be met before the commencement date began. Included in the preconditions was a requirement that construction specifications and design drawings had to be approved by December 15, 2004.[13]  (Ex. P-7 at § 3.3(1)-(6).)  The lease also

---

[13] The contract had other clauses that mandated construction and development of the project. The lease states in part:

> A contractor engaged by Tenant and approved by Landlord . . . shall construct Tenant's Work in accordance with Tenant's Approved Plans pursuant to a contract (the "General Contract") with a guaranteed maximum price (the "GMP"), which GMP shall not exceed the amount allocated for such purposes in the Budget (or such greater amount mutually agreed by the parties).

> After tenant's Approved Plans are approved by Landlord and Tenant, Tenant shall cause a cost estimate to be prepared which shall include the cost of all items in Tenant's work and all "associated Costs" . . . If the amount of the Cost Estimate exceeds Seven Million Two Hundred Thousand Dollars ($7,200,000.00) ("the Budget"), Landlord and Tenant shall attempt to "value engineer" Tenants' Work in an effort to reduce the cost thereof . . . provided that the design, construction, finish and equipping of Tenant's Work shall be generally of the same quality and level as the RumJungle in Mandalay Bay Hotel and Casino in Las Vegas, Nevada (hereinafter the "Standard") . . . .

provided for a build-out cost of $7.2 million, unless both parties agreed on a different amount. Of the $7.2 million, $1.7 million was to be provided by Caesar's, the ground lessor at The Pier. (Faggen Tr., 21:2-3, Oct. 26, 2015.)  The remaining balance of $5.5 million was to be supplied through another lease referred to as the RumJungle equipment lease.  (Ex. P-8; Faggen Tr. 21:17-20, Oct. 26, 2015.)  On August 11, 2004, a company named Pier Jungle, which was formed by the Gordon Group, and ACNC, LLC entered into the equipment lease for the financing of RumJungle at The Pier.  (Id.)

On March 31, 2005, ACREST, LLC, another entity in the Chodorow Organization, signed the lease to open the English is Italian restaurant at The Pier.  (Ex. P-22.)  The English is Italian lease is substantially similar to the RumJungle lease.  Several terms with respect to construction were identical.  (Ex. P-23.)  Pier Jungle also signed an equipment lease with ACREST, LLC for English is Italian.  (Id.)

### G. The RumJungle Lease is Amended

Since the Chodorow Organization was concerned about the location of The Pier being subpar to its Las Vegas location, preconditions on building costs were paramount.  Sheldon

---

If in the opinion of either Landlord or Tenant it is not feasible to value engineer Tenant's Approved Plans so as to reduce the cost of Tenant's Work and the Associated Costs to the Budget and at the same time maintain the Standard, and neither Landlord nor Tenant is willing to pay the excess cost over the Budget and Landlord and Tenant cannot agree on how to share payment of any excess cost over the Budget, then either Landlord or Tenant may, upon ten (10) days written notice to the other, delivered no later than January 15, 2005, terminate this Lease, whereupon neither Landlord not Tenant shall have any further obligation to the other pursuant to or in connection with this lease.

(Ex. P-7 at § 3.3(7)-(9).)

The Chodorow Organization was concerned that the RumJungle nightclub at The Pier would not be built to the same standard it maintained at its location in Las Vegas.  The group wanted to create the same experience at The Pier that it created at the Mandalay Bay.

Gordon acknowledged that the original $7.2 million agreement was not an obtainable budget because RumJungle could not be built for that cost. [14]   (Sheldon Gordon Tr., 157:6, Nov. 2, 2015.)

On March 31, 2005, the RumJungle lease was amended.[15]   (Ex. P-21.)   This lease substituted Atlantic Pier Associates, LLC as the landlord under the RumJungle Lease.[16]   (Id.) The delivery date was changed to July 1, 2005 and final working drawings were due on July 15, 2005.  (Id.)

### H. In Late 2005 Landlord Gives Notice of Delivery of the Premises to the Chodorow Organization

On October 31, 2005, the landlord gave notice of delivery of the premises to the tenant under the RumJungle and English is Italian leases.  (Exs. P-35, P-36.)  On November 11, 2005, Neil Faggen of the Chodorow Organization wrote a letter to the landlord regarding these leases. (Exs. D-13, D-14.)  Faggen noted that the cost estimates had exceeded the budget and that even though the landlord and tenants had worked together to value engineer the projects to reduce

---

[14] The $7.2 million appears to have been used as a starting point until the parties could mutually agree on a more precise, accurate, and appropriate number for what RumJungle would cost to build.  Sheldon Gordon testified that for a project of this size and magnitude, it is difficult to know exactly how much it would cost to build-out the space.  (Sheldon Gordon Tr., 158:14-17, Nov. 2, 2015.)  Based on preconditions in the lease, without an agreed upon number, the project would not have gone forward.  Both parties to this lease actively worked, however, toward determining a precise amount of building costs.

[15] Faggen testified that one of the purposes of the amendment was to extend the deadlines of the original lease.  The Chodorow Organization chose to amend the original lease rather than to walk away from the lease entirely, because it was still interested in opening at The Pier. (Faggen Tr., 189:11-19, Oct. 26, 2015.)  Faggen also noted that the Chodorow Organization was willing to have RumJungle open at The Pier so long as an appropriate budget could be agreed upon.  (Id.)

[16] As noted, in January 2005, Pier Developers, Inc., and an affiliate of Taubman Centers, Inc., formed an entity named Atlantic Pier Associates, LLC, which then became the owner of The Pier.

costs, the budget figures still exceeded the agreed upon amount; therefore the landlord or the tenants had the right to terminate the leases.  (Id.)  At that time, though, the tenants did not terminate the RumJungle or English is Italian leases, but sought extensions of applicable time periods.[17]

The Faggen letter dated November 11, 2005 shows that good faith efforts to value engineer the project were undertaken.[18]  To make the project attainable, the Chodorow Organization worked for approximately the next fourteen months toward satisfying the outstanding conditions under the leases.[19]  The landlord and tenants worked tirelessly over this period to bring in architects, builders, and designers.  They also worked continuously to value engineer the project with the expectation that both RumJungle and English is Italian would open at The Pier.  In this regard, Gordon Group Holdings alone expended in excess of $1 million on architectural and engineering services, value engineering, designers, and consultants in

---

[17]  Faggen wrote: "The time periods for the exercise of these [termination] rights have been extended by mutual agreement of the parties, as it is the continuing desire and hope that these preconditions will be timely achieved."  (Ex. D-13.)  While Faggen's letters did not terminate the tenants' leases, he did leave the door open to do so in the future.  "Unfortunately, your letter regarding delivery of the Premises, including the letter's express reference to the remedies of Landlord to complete Tenant's obligations under the Lease, requires that the Tenant preserve its legal rights."  (Id.)  Faggen testified at trial that he believed he "was preserving my rights under the lease, including my right to take the position that the landlord was in default."  (Faggen Tr., 206:6-10, Oct. 26, 2015.)

[18]  Faggen's letter suggests that the Chodorow Organization was hopeful that a mutual agreement would be reached.  "The parties have been cooperating to satisfy these preconditions and working diligently on all of the required tasks.  We fully expect to successfully achieve these goals . . . In the interim, the Tenant shall continue to work towards satisfying the outstanding conditions under the Lease."  (Exs. D-13, D-14.)  Faggen testified that he was trying to "walk a fine line" by giving the "landlord an opportunity to get this back on track."  (Faggen Tr., 97:3-9, Oct. 26, 2015.)

[19]  Numerous documents in the record suggest a continuous attempt by Defendants to value engineer and to pursue the RumJungle project at The Pier.  (See, e.g., Exs. D-9, D-21, D-28, D-32, D-68.)

connection with the RumJungle and English is Italian leases.  (Faggen Tr., 226:4, Oct. 26, 2015; Fine Tr., 76:6-18, Nov. 3, 2015.)  (See also Exs. D-68, D-69, D-72, D-74.)  They did so because, as noted, they believed in good faith that the RumJungle and English is Italian projects would open at The Pier.

As late as March 2007, Faggen sent Fine a proposed management agreement and second amendment to the lease.  (Ex. D-73.)  In November 2007, Faggen sent another letter to the landlord referring to RumJungle as a tenant under the lease, stating "the tenant will vigorously contest any remedies undertaken or exercised by the landlord or equipment lessor to dispossess the tenant or to effect any of the tenant's rights in and to the premises demised pursuant to the lease and equipment lease."  (Ex. D-82.)  This letter, dated November 19, 2007, shows that the tenants were still asserting their rights under the RumJungle and English is Italian leases.  It also shows that the leases had not been terminated by either party and were still in effect as of November 2007.[20]  (Id.)

### I. In Late 2005 Landlord Gives Notice of Delivery of the Premises to the Starr Organization for Buddakan

Under the terms of the original contract, the landlord was required to deliver the Buddakan premises by September 12, 2005.  (Ex. P-5.)  The landlord, however, did not meet this delivery date.  (Scott Gordon Tr., 7:16-21, Oct. 29, 2015.)  Instead, on November 1, 2005, the landlord sent formal pre-delivery notices to Buddakan and Continental.  On November 7, 2005, the landlord sent formal notice of delivery letters to Buddakan and Continental, stating in relevant part, "this is to advise you that the leased premises are hereby delivered pursuant to

---

[20] Fine further elaborated on this point at trial, stating, "[Chodorow] still wanted to be in the space.  He still wanted to—have the space.  He—he wanted to—to open something in the space after all the work that had gone on."  (Fine Tr., 81:11-21, Nov. 3, 3015.)

Section 3.3 of the Lease." (Ex. P-40.)  At this point, however, Starr and his organization had already begun the process of negotiating with the landlord to amend the leases. (Starr Tr., 25:7-15, Oct. 28, 2015.)  The amendments would include extensions of all applicable deadlines.

In response to the delivery notice, Starr, through his counsel, prepared a response on November 11, 2005 that alleged that the delays in delivery of the premises under the Buddakan and Continental leases had caused his organization substantial harm.[21] (Exs. P-42, D-12.)  Starr then requested a letter from the Gordon Group detailing the other potential occupants under lease agreements and the status of construction for each occupant. (Id.)  Neither the Buddakan or Continental leases required the landlord to provide Starr with this information.  Starr did not focus his requests on RumJungle or English is Italian.  He did not request copies of any actual leases or default notices.

---

[21] Starr's letter stated in relevant part:

> As you know, delivery of our premises should have been made in September 2005 so that the lease commencement dates could have occurred by March 12, 2006. Even at this late date, there is uncertainty as to the date of the Center's Grand Opening . . . We have since seen neither a final notification, nor any facts on the ground regarding the Center and the opening plans of other tenants that give us comfort that a real Grand Opening on this, or any particular, date will be achieved.  In addition to the ongoing costs we have experienced and will continue to experience from these delays and from your delays in resolving the access issue that resulted in delays in permitting and the start of construction for our premises, we have been harmed because our financing plans for this project, including presentations to investors and lenders, were predicated on a timely opening that will now not be achieved.
>
> . . . We require greater certainty than you have yet provided. Specifically we require formal notice of a firm, committed date for the Center's opening and a detailed schedule showing the percentage of the center under binding leases and the parties thereto.

(Ex. P-42.)

**J.  The December 16, 2005 Letter**

On December 16, 2005, the landlord responded to the Starr letter by correspondence from

Peter Fine.  (Ex. P-57.)  Fine's letter stated:

> Pursuant to your letter received by us on November 11, 2005, please find attached
> a list of Tenants with executed leases and leases in negotiation with The Pier at
> Caesar's in Atlantic City.   Please be advised that we anticipate all leases-in-
> negotiation being signed by the end of this calendar year.  All of these negotiating
> Tenants are determined to make our Grand Opening and are fully immersed in the
> Project and moving forward with their design process.
>
> Further to your request, a formal notice of a firm Grand Opening Date was sent to
> your office in November, indicating our intent to open the Project on May 17,
> 2005 [sic].[22]

(Id.)  Fine also attached a list of "leases executed."  (Id.)  Fine's letter dated December 16, 2005

provided Starr not only with this list, but also with an intended opening date and leases in

negotiation.  Fine provided no assurance as to whether the leases were binding.  (Id.)  RumJungle

and English is Italian were accurately listed as "leases executed" in the attachment to the letter,

because at the time the leases were executed and signed.  Plaintiffs thereafter made no attempt to

determine if there was a difference between an "executed" lease or a "binding" lease.

**K.  The Amended Leases**

In the weeks that followed Fine's letter dated December 16, 2005, negotiations between

Plaintiffs and Defendants took place regarding the extension of deadlines and the amendment of

the two leases covering Buddakan and Continental.  (Robkin Tr., 35:19-23, Oct. 27, 2015.)

During these negotiations, in January of 2006, Robkin, Fine, and Sheldon Gordon made a trip to

Atlantic City to take a walk through The Pier.  (Robkin Tr., 53:13-54:6, Oct. 27, 2015.)  Robkin

---

[22] The original letter appears to contain a typographical error.  Apparently, the letter should note
a Project opening date of May 17, 2006.

sought assurances during this trip as Plaintiffs continued negotiating the Amended Leases.  (Id.)
On February 22, 2006, an Amended Lease was entered into by Atlantic Pier Associates, LLC and
Boardakan for the operation of Buddakan at The Pier.  (Ex. P-85.)   On the same date, an
Amended Lease was entered into by Atlantic Pier Associates, LLC and Oceanental for the
operation of a Continental restaurant and lounge at The Pier.  (Ex. P-86.)

The Amended Leases make no reference to an assurance that RumJungle or English is
Italian would open at The Pier.  The negotiated points between the landlord and the tenant dealt
with a reduction in rent for the tenants, an increased construction allowance, and a co-tenancy
provision.  (Exs. P-85, P-86.)  The points did not specifically reference the opening of either
RumJungle or English is Italian as a prerequisite for the Buddakan and Continental tenancies to
move forward.

The purpose of the co-tenancy provision was to give the tenants a rent reduction and/or
the right to terminate the leases in their entirety if a minimum number of tenants did not open for
business at The Pier by a specified date.[23]  The draft versions, as well as the final version, of the

---

[23] The lease amendment contained the following co-tenancy provision:

> In the event Tenant shall open for business prior to the date that at least five (5) of
> the (7) additional restaurants at the Center (to be occupied by Sonsie, Phillips
> Seafood, English is Italian, Game On, Dubliner, RumJungle, and on additional
> restaurateur or by other restaurants of comparable quality) are open for business
> (the "Co-Tenancy"), and provided Tenant is not in default hereunder, Tenant shall
> pay to Landlord in lieu of Minimum Monthly Rent, Percentage Rent and any and
> all other charges or sums that are payable under this lease . . .

> In the event (i) the Co-Tenancy is not satisfied and (ii) at least seventy five
> percent (75%) of the rentable floor area of the Center to be occupied by other
> retail tenants is not open of business, by December 31, 2006, Tenant shall have
> the right to terminate this Lease upon written notice to the Landlord delivered no
> later than January 15, 2017.

(Ex. P-85.)

co-tenancy provision did not require the participation of RumJungle or English is Italian at The Pier. It required, though, that at least five of seven named restaurants opened. In fact, the provision could be satisfied without the opening of any restaurants, so long as there was sufficient retail tenant occupancy. (See Exs. D-8; D-19; D-20; D-22-27; D-29.) The landlord complied with this term because five restaurants, Sonsie, Phillips Seafood, Game On, Dubliner, Continental, and Buddakan, had opened at The Pier. Plaintiffs conceded at trial that the co-tenancy provision was not limited to RumJungle opening at The Pier.[24]

### L.  The February 9, 2006 Email and Request

On February 9, 2006, prior to executing the Amended Leases, David Robkin sent Peter Fine an email requesting updated information regarding the status of "permitting, construction, and expected opening date" of the other restaurants at The Pier. (Ex. P-78.) Peter Fine emailed Robkin a response later that day and attached a "special spreadsheet" that responded to Robkin's requests. (Exs. P-79, P-79A.) The spreadsheet listed executed and negotiated leases and was based upon information provided to Peter Fine by parties familiar with The Pier project.[25] (Ex. P-79A.) At the time Fine emailed Robkin the spreadsheet, the information contained on the spreadsheet was accurate. Also at the time the spreadsheet was sent, RumJungle and English is Italian had an approved set of plans to buy kitchen equipment and had an approved plan for a

---

[24] When questioned as to why they entered into a co-tenancy provision without a requirement that RumJungle open at The Pier, David Robkin testified: "Shame on us . . . we did not do that." (Robkin Tr., 210:10-20, Oct. 27, 2015.)

[25] The parties who were consulted for the letter included several architects and construction companies familiar with the progress of various tenant projects at The Pier.

19

storefront.[26]   (Faggen Tr., 108:19-22, 111:22-23, Oct. 26, 2015.)   Each of these developments show a continued commitment by Defendants to opening RumJungle and English is Italian at The Pier.

On February 22, 2006, Atlantic Pier Associates, LLC entered into lease amendments with Oceanental for the operation of a Continental restaurant and lounge at The Pier and with Boardakan for the operation of a Buddakan restaurant at The Pier.   (Exs. P-85; P-86.)   As a consequence of the Lease Amendments, Boardakan and Oceanental received a reimbursement of approximately $1 million in "soft costs" that they would not have received if they had chosen to walk away from the deal.   (Robkin Tr., 63:13-25, 235:19; 236:17, Oct. 27, 2015.)

### M.   The Two Chodorow Restaurants, RumJungle and English is Italian, Do Not Open

RumJungle and English is Italian did not open at The Pier.   But Defendants did as much as they could to insure that the restaurants of the Chodorow Organization opened there.   As noted, Defendants used in excess of $1 million of their own funds, which Scott Gordon testified was in furtherance of a good faith effort to have RumJungle and English is Italian open.   (Faggen Tr., 226:4, Oct. 26, 2015; Scott Gordon Tr., 233:1-18, Oct. 29, 2015.)   Peter Fine and Scott Gordon both testified at trial that they were confident and believed RumJungle and English is Italian would open.[27]

---

[26] Faggen also testified that the landlord and tenant were frequently discussing other options regarding "possible start dates if certain things happened and lined up; the plans, [and] the budget."   (Faggen Tr., 150:3, Oct. 26, 2015.)

[27] Fine testified that he was confident that "we had a design and were approaching a budget that the investors would agree to based on the pro forma that we got from—from Jeffrey Chodorow.   It indicated a very significant profit from the business.   We had very motivated investors, we had a very motivated tenant, and we had everybody working diligently on the process.   I believed we would get it done."   (Fine Tr., 60:4, Nov. 3, 2015.)   Scott Gordon

Additionally, Defendants' belief that RumJungle and English is Italian would open at The Pier is supported by a proposed management agreement and second amendment to the lease sent from Neil Faggen to Peter Fine in March 2007.[28]  (Ex. D-73.)  As noted previously, in November 2007, Faggen also sent a letter to the landlord referring to RumJungle as a tenant under the lease and stating that the tenant would continue to exercise or affect any of the tenant's rights in and to the premises.  (Ex. D-82.)  This letter shows that for two years following the initial Faggen letter, the Chodorow Organization still believed it was operating under the terms of the original leases and that neither party had terminated them.  Peter Fine testified that the Chodorow Organization still wanted to open at The Pier.[29]  Each of these statements and letters show Defendants had a continuing commitment to open RumJungle and English is Italian at The Pier as late as the end of 2007.

## III.    CONCLUSIONS OF LAW

This action arose out of negotiations between Plaintiffs and Defendants concerning the Buddakan and Continental restaurants at The Pier in Atlantic City.   Plaintiffs alleged the following claims against Defendants:  Count I—Fraudulent Inducement Based on Misrepresentation, Nondisclosure, and Concealment;  Count II—Negligent Misrepresentation;

---

agreed with Peter Fine's sentiment in his testimony, stating that as of June 9, 2006, he "definitely, definitely" believed the RumJungle and English is Italian were committed projects.  In fact, Gordon testified that they "never stopped being committed to the project."  (Scott Gordon Tr., 267:16-22, Oct. 29, 2015.)

[28] As of March 2007, Fine described the RumJungle deal as "[s]till moving forward.  Still value engineering."  (Fine Tr., 80:1-20, Nov. 3, 2015.)

[29] Fine testified that the Chodorow Organization would have objected to another nightclub appearing at The Pier, a further showing of the Chodorow Organization's continued effort to open RumJungle at The Pier.  (Faggen Tr., 249:7-18, Oct. 26, 2015.)

Count III—Civil Conspiracy;[30] Count IV—Promissory Estoppel; and Count V—Alter Ego.[31] (Doc. No. 147.)

Since this action arises under diversity of citizenship jurisdiction, this Court has jurisdiction over this case pursuant to 18 U.S.C. § 1332.[32]

As discussed above, this litigation culminated in a seven-day bench trial.  During a bench trial, "in addition to resolving legal issues, the [Court's] role . . . includes evaluating the credibility of witnesses and weighing the evidence."  Baker v. Baker, No. 10-1955, 2011 WL 129164, at *1, n.1 (E.D. Pa. Jan. 12, 2011) (citing Fed. R. Civ. P. 52(a); Inwood Labs, Inc. v. Ives Labs, Inc., 456 U.S. 844, 856 (1982)).  In accordance with Fed. R. Civ. P. 52(a), the Court will now state its conclusions of law.

### A. Plaintiffs Have Not Met Their Burden of Proving Fraudulent Inducement as Alleged in Count I

Plaintiffs' first claim arises under the Pennsylvania law of fraud.  (Doc. No. 247-1 at 87.) In order to establish a claim for fraud under Pennsylvania law, a plaintiff must prove by clear and convincing evidence: (1) a misrepresentation, (2) a fraudulent occurrence, (3) an intention by the defendant that the plaintiff will thereby be induced to act, (4) justifiable reliance by the plaintiff on the misrepresentation, and (5) damage to the plaintiff as the proximate result.  Browne v.

---

[30] As previously noted, the civil conspiracy claim asserted in Count III of the Second Amended Complaint was dismissed in an Order dated July 31, 2015.  (Doc. No. 220.)

[31] Plaintiffs assert a claim for "Alter Ego."  (Doc. No. 147 at ¶¶ 167-71.)  However, as discussed above, if Plaintiffs do not prevail on their other claims, there is no basis for imposing alter ego liability on Defendants.

[32] Under 28 U.S.C. § 1332(a): "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—(1) citizens of different States."  Id.

Maxfield, 663 F. Supp. 1193, 1202 (E.D. Pa. 1987) (citing Scaife Co. v. Rockwell-Standard Corp., 285 A.2d 451, 454 (Pa. 1971)).

Combining the first and second elements of a common law fraud claim—(1) a misrepresentation and (2) a fraudulent occurrence—demonstrates that fraud can be proven using multiple theories.  Delahanty v. First Pennsylvania Bank, N.A., 464 A.2d 1243, 1252 (Pa. 1983).  "Fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture."  Id. (citing Frowen v. Blank, 425 A.2d 412 (Pa. 1981)).  However, "it is equally clear that a promise to do something in the future and the failure to keep that promise is not fraud."  Greenburg v. Tomlin, 816 F. Supp. 1039, 1054 (E.D. Pa. 1993).  A plaintiff must prove that the defendant misrepresented, in some way, a past or present material fact.  Id. (citing Moser v. DeSetta, 589 A.2d 679, 682 (Pa. 1991); Krause v. Great Lakes Holdings, Inc., 563 A.2d 1182, 1187 (Pa. 1989)).

The most apparent theory of fraud is a defendant's direct misrepresentation of a past or present material fact.[33]  Under a theory of direct misrepresentation, "[f]raud is proved when it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false."  Delahanty, 464 A.2d at 1252 (citing Warren Balderston Co. v. Integrity Trust Co., 170 A.2d 282 (Pa. 1934)).  A defendant's

---

[33] Black's Law Dictionary defines "misrepresentation" as:

> The act or an instance of making a false or misleading assertion about something, with the intent to deceive.  The word denotes not just written or spoken words but also any other conduct that amounts to a false assertion.

Black's Law Dictionary 1152 (10th ed. 2014).

statements or positive assertions are generally required to show that a direct misrepresentation was made.

A less conspicuous theory of fraud is nondisclosure.  Pennsylvania courts have held that "the deliberate nondisclosure of a material fact amounts to a culpable misrepresentation no less than does an intentional affirmation of a material falsity."  Neuman v. Corn Exchange Nat'l Bank & Trust Co., 51 A.2d 759, 764 (Pa. 1947).  A defendant's nondisclosure of information may amount to fraud when the plaintiff relies upon the defendant's omission of a material fact to his detriment.  Id.  In addition, a defendant's incomplete disclosure can result in misleading "half-truths," where a material fact is not disclosed to the plaintiff.  Id.  When this occurs, the plaintiff may recover under a theory of nondisclosure.  For example, in In re Unisys Corp. Retiree Medical Benefits ERISA Litigation, the court held that a corporation failed to disclose all material facts to employees who enrolled in its medical benefits program.  No. 03-3924, 2006 WL 2822261, at *49-50 (E.D. Pa. Sept. 29, 2006).  In particular, the corporation failed to disclose that it could terminate an employee's medical benefits when it provided employees with the information about the benefit plans.  Id.  By failing to disclose this material fact, the corporation's incomplete disclosure was a misleading "half-truth."  Id. (citing Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d, 186, 200, n.19 (3d Cir. 1990)).  Omitting material facts in a "half-truth," the court explained, amounted to fraudulent nondisclosure of important information regarding the corporation's ability to terminate benefits.  Id.

In addition to nondisclosure and misrepresentation, there is another common theory of fraud—concealment.  Fraudulent concealment occurs when a defendant takes action "to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information."  Gnagey Gas & Oil Co. v. Pennsylvania Underground Storage

24

Tank Indemnification Fund, 82 A.3d 485, 500 (Pa. Commw. Ct. 2013).  For example, the court

in V-Tech Services v. Street, reasoned that:

> To be actionable, a misrepresentation need not be in the form of a positive
> assertion, but is any artifice by which a person is deceived to his disadvantage and
> may be by false or misleading allegations or by concealment of that which should
> have been disclosed, which deceives or is intended to deceive another to act upon
> it to his detriment.  Concealment can be a sufficient basis for finding that a party
> engaged in fraudulent conduct, provided that the other requisite elements of fraud
> are established. While concealment may constitute fraud, however, mere silence
> is not sufficient in the absence of a duty to speak.

72 A.3d 270, 275-76 (Pa. Super. Ct. 2013) (citing Wilson v. Donegal Mutual Ins. Co., 598 A.2d

1310, 1315 (Pa. Super. Ct. 1991)).  There, the court emphasized that although fraud can be found

through a defendant's deceptive concealment of important information, a defendant's "mere

silence" is not enough to constitute fraud.  Id.  Understanding the theories of fraud that may be

proven is essential in assessing Plaintiffs' common law fraud claim.

In addition to proving the first two elements of a Pennsylvania common law fraud

claim—(1) misrepresentation and (2) fraudulent occurrence—either through a direct

misrepresentation, nondisclosure, or concealment, the plaintiff must also prove: (3) that the

defendant intended for the plaintiff to be induced to act, (4) that the plaintiff justifiably relied on

the defendant's misrepresentation, and (5) that the plaintiff suffered damages as the proximate

result of that reliance.  Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 296 (3d Cir. 1991).

The third element of a fraud claim noted above requires the plaintiff to prove that the

defendant intended the plaintiff to be induced to act in a certain way.  Id.  The defendant's

"knowledge of the untrue character of his representation, is a key element in finding fraudulent

misrepresentation."  Ira G. Steffy & Son, Inc. v. Citizens Bank of PA, 7 A.3d 278, 290 (Pa.

Super. Ct. 2010).  There must be a showing that the defendant possessed the requisite fraudulent intent when making the misrepresentation, or omitting the material fact.

The fourth element of a fraud claim requires the plaintiff to show that he justifiably relied on the defendant's misrepresentation.  Sowell, 926 F.2d at 296.  "Whether reliance on an alleged misrepresentation is justified depends on whether the recipient knew or should have known that the information supplied was false."  Fort Washington Resources, Inc. v. Tannen, 858 F. Supp. 455, 461 (E.D. Pa. 1994).  Where the means of obtaining the information in question were not equal, the representations of the person believed to possess superior information may be relied upon.  Id. (citing Siskin v. Cohen, 70 A.2d 293, 295 (Pa. 1950)).  And, in deciding whether the plaintiff justifiably relied on the information, a court may consider the degree of sophistication of the parties and the history of the negotiation process between them.  Greenburg v. Tomlin, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993).

The final element of fraud requires the plaintiff to prove damages.  Sowell, 926 F.2d at 296.  Specifically, the plaintiff must prove that any damages incurred were the proximate result of the defendant's action or inaction.  Id.; Snell v. Com. State Examining Board, 416 A.2d 468 (Pa. 1980).  Without damages, the plaintiff cannot recover.  Having now reviewed the common law elements of fraud in Pennsylvania, the Court will assess whether Plaintiffs have met their burden of proving by clear and convincing evidence that Defendants committed fraud.

Here, Plaintiffs argue that Defendants committed fraud under three theories.  First, Plaintiffs allege that Defendants made direct misrepresentations when negotiating the Buddakan and Continental Amended Leases at The Pier.  (Doc. No. 247-1 at 96-99, 116-21.)  Second, Plaintiffs contend that Defendants communicated "half-truths" to Plaintiffs when negotiating the Amended Leases, which amounted to nondisclosure of important information.  (Id. at 99-103,

121-25.) Third, Plaintiffs allege that Defendants committed fraud by concealment—that is, Defendants hid pertinent information about the RumJungle and English is Italian leases. (Doc. No. 247-1 at 103-05, 125-26.) These actions, Plaintiffs contend, amount to actionable fraud on the part of Defendants. Each of Plaintiffs' fraud arguments will be reviewed in turn.

### i.   Defendants Did Not Commit Fraud by Making Direct Misrepresentations

Plaintiffs first argue that Defendants made direct misrepresentations during negotiations, which amounted to fraud. A theory of fraud by direct misrepresentation requires a showing that Defendants made statements or positive representations about past or present material facts that were false. See Delahanty v. First Pennsylvania Bank, N.A., 464 A.2d 1243, 1252 (Pa. 1983) (noting that fraud can occur when a defendant makes a positive assertion to plaintiff that is false). Defendants must make these statements knowingly, or in conscious disregard of the truth, or recklessly without caring whether the statement is true or false. Id.

Plaintiffs rely on three main events to demonstrate that Defendants committed fraud by direct misrepresentation: (1) Fine's letter dated December 16, 2005; (2) the January 2006 walk through with Robkin; and (3) Fine's "special spreadsheet" email dated February 9, 2006.

Plaintiffs claim that Fine's letter dated December 16, 2005 was a direct misrepresentation. (Doc. No. 247-1 at 96.) In particular, Plaintiffs' allege that Fine's letter, which included a list of "executed leases" in response to Starr's request for a list of "binding leases," was a direct misrepresentation. (Id.) Plaintiffs essentially contend that Defendants should not have represented that the RumJungle and English is Italian leases were executed until the necessary funds were raised to make the project come to fruition. (Id. at 97.) Plaintiffs assert that RumJungle and English is Italian, if listed at all, should have been listed as part of the "negotiated leases" in Fine's letter. (Id.)

27

This argument, however, is unpersuasive.  Fine's response contained a complete and accurate list of the executed leases for The Pier.  (Doc. No. 248 at 22.)  RumJungle and English is Italian were accurately listed as executed leases because these agreements had in fact been executed by the respective parties.  (Id.)  In fact, it would have been false to have omitted the RumJungle and English is Italian leases from Fine's letter because these leases were in effect. (Id.)  Therefore, Plaintiffs have not met their burden of showing that Defendants made a direct misrepresentation in Fine's letter dated December 16, 2005.

Plaintiffs' claim that Defendants made further direct misrepresentations during the January 2006 walk through at The Pier.  (Doc. No. 247-1 at 112.)  As noted above, in January of 2006, Robkin, Fine, and Scott Gordon made a trip to Atlantic City to walk through The Pier site. (Robkin Tr., 46:7-14, Oct. 27, 2015.)   During this trip, Robkin wanted to observe how the construction and development of The Pier was moving along, and sought assurances from Defendants before Plaintiffs signed the Amended Leases.  (Id.)  Plaintiffs claim that Defendants made direct misrepresentations during this walk through.  (Doc. No. 247-1 at 112.)  For instance, Plaintiffs argue that Robkin was told that RumJungle would, in fact, open.  (Id.)  However, Robkin testified that although he received assurances that RumJungle would open, he was also told that the project "had been delayed" due to issues with value engineering and cutting costs, and that Defendants were working with the Chodorow Organization to open the restaurant. (Robkin Tr., 58:17-59:11, Oct. 27, 2015.)

Defendants did not make direct misrepresentations to Robkin at this time.   Rather, Defendants informed Robkin that the RumJungle project had been delayed and that Defendants believed in good faith that, by working with the Chodorow Organization, RumJungle would

28

open at The Pier.  The discussions with Robkin during the January 2006 walk through do not demonstrate that Defendants made direct misrepresentations to Plaintiffs.

Plaintiffs also point to Fine's "special spreadsheet" sent to Plaintiffs in an email dated February 9, 2006 as evidence that Defendants committed fraud by making direct misrepresentations.  (Doc. No. 247-1 at 116.)  As previously discussed, on February 9, 2006, Robkin emailed Fine requesting updated information regarding "permitting, construction," and expected opening dates of the restaurants and retail shops at The Pier.  (Ex. P-78.)  On that same day, Fine responded to Robkin's request by emailing a spreadsheet listing the executed and negotiated leases at The Pier.  (Exs. P-79, P-79A.)  Plaintiffs contend that the information in the spreadsheet was inaccurate because it stated, for example, that RumJungle's storefront "will be completed by Mid-June."  (Doc. No. 247-1 at 116.)  However, Plaintiffs' argument is incorrect. Fine's spreadsheet contained accurate information about the status of the executed and negotiated leases at The Pier, and contained accurate estimates, to the best of Defendants' knowledge, as to when the storefronts would open.  It does not, as Plaintiffs contend, make direct misrepresentations as to any past or present material fact about the development of The Pier.

In sum, Plaintiffs allege that the statements made to members of the Starr Organization about the RumJungle and English is Italian leases induced Plaintiffs to agree to the Amended Leases for the Buddakan and Continental restaurants.   In this sense, Plaintiffs argue that Defendants misrepresented the status of the RumJungle and English is Italian leases, all in an effort to secure Plaintiffs' restaurants at The Pier.  But during the relevant time period, the representations made by both Defendants Sheldon Gordon and Peter Fine regarding the RumJungle and English is Italian leases were true.  At every juncture when Starr or Robkin inquired about leases of other restaurants, they were given accurate information about executed

leases or leases in negotiation.[34]  (See Exs. P-22, P-23.)  The evidence produced by Defendants, as well as Neil Faggen's testimony at trial, support the fact that the RumJungle and English is Italian leases were in place when Starr signed his Amended Leases.  (See Exs. D-13, D-14.) Plaintiffs have not met their burden of proving by clear and convincing evidence that the RumJungle and English is Italian leases were terminated before Starr signed his Amended Leases, nor have Plaintiffs proven that Sheldon Gordon, Scott Gordon, or Peter Fine misrepresented the true state of these leases.  Because no direct misrepresentations were made about the RumJungle and English is Italian leases at the time Starr signed the Amended Leases, Plaintiffs fail to prove fraud by direct misrepresentation.[35]

### ii. Defendants Did Not Commit Fraud by Nondisclosure

Plaintiffs next argue that Defendants are liable under a theory of fraudulent nondisclosure of material facts.  Under a theory of fraudulent nondisclosure, a defendant will be held liable when he deliberately omits material facts in his statements to a plaintiff in order to induce the

---

[34]  While it is true that the Chodorow Organization preserved their right to terminate the RumJungle and English is Italian leases before Starr signed the Amended Leases for Buddakan and Continental, the Chodorow Organization did not elect to exercise that right before Starr signed his leases.  Had the Chodorow Organization exercised its right to terminate the leases and had Starr not been informed of this fact by either Defendants Fine or the Gordons before signing the Amended Leases, the failure to disclose would have been a direct misrepresentation.  However, the alleged nondisclosure did not occur in this case.

[35]  Plaintiffs also argue that the Chodorow Organization's ultimate decision not to have RumJungle and English is Italian participate in The Pier is sufficient proof that they were defrauded.  But courts have held that "it is equally clear that a promise to do something in the future and the failure to keep that promise is not fraud.  Rather, a cause of action for fraud requires that a misrepresentation of a past or present material fact be pleaded and proved." Greenberg v. Tomlin, 816 F. Supp. 1039, 1054 (E.D. Pa. 1993).  At trial, Plaintiffs did not offer any evidence that a past or present material misrepresentation of fact regarding the RumJungle or English is Italian leases was made by Peter Fine or Sheldon Gordon.  The statements Peter Fine and Sheldon Gordon made about RumJungle and English is Italian orally and in correspondence were not material misrepresentations.  For these reasons, Plaintiffs' theory of fraud by direct misrepresentation fails.

plaintiff to act in a certain manner.  <u>Neuman v. Corn Exchange Nat'l Bank & Trust Co.</u>, 51 A.2d 759, 764 (Pa. 1947).  In addition, a defendant may be liable for stating misleading "half-truths" which omit material facts from his representation.  <u>See Hoxworth v. Blinder, Robinson & Co.</u>, 903 F.2d 196 (3d Cir. 1990) (defining "misleading half-truths" as "failures to disclose sufficient information to render statements actually made not misleading").

Here, Plaintiffs allege that Defendants made "half-truths" that induced Plaintiffs to enter into the Buddakan and Continental Amended Leases and for this reason have committed fraud. (Doc. No. 247 at 88-90.)  Plaintiffs argue that Defendants made "half-truths" during negotiations by providing some relevant information, but also by omitting material information.  (<u>Id.</u>)  In essence, Plaintiffs argue that Defendants withheld information that materially affected Plaintiffs' decision to continue the leases at The Pier.[36]  (<u>Id.</u>)  Plaintiffs assert, for example, that Fine's Letter dated December 16, 2005 contained misleading "half-truths" about the status of the RumJungle and English is Italian leases.  (Doc. No. 247 at 99.)  Fine's letter included a list of "leases executed."  (Ex. P-57.)  This letter was not misleading, as Plaintiffs contend.  RumJungle and English is Italian were accurately listed as "leases executed" in the letter, because at the time the leases were executed and signed.  (Doc. No. 248 at 22.)  In each letter or inquiry that the Starr Organization made, Plaintiffs were met with truthful answers at the time about the state of the executed leases and leases under negotiation.  (<u>Id.</u>)  The answers were complete to the best of Defendants' knowledge and did not omit material facts.  (<u>Id.</u>)  Therefore, Defendants did not

---

[36]At the time Starr sent letters requesting additional information, leases with both RumJungle and English is Italian existed.  Additionally, representatives of the Chodorow Organization consistently stated that they had no intention of terminating the leases and that they would do everything in their power to come to an agreement with Defendants in order to have RumJungle and English is Italian open at The Pier.  (Exs. D-13, D-14.)

commit fraud because each communication with the Starr Organization contained truthful statements at the time of their transmission and did not fail to disclose material information.

### iii.    Defendants Did Not Commit Fraud by Concealment

Plaintiffs also argue that Defendants concealed material information during the negotiation and execution of the Buddakan and Continental leases.  (See, e.g., Doc. No. 247-1 at 128.)  Plaintiffs argue that Defendants took action "to conceal, create a false impression, mislead, or otherwise deceive in order to prevent [them] from acquiring material information."  United States v. Basroon, 38 F. App'x. 772, 780 (3d Cir. 2002) (citing United States v. Colton, 231 F.3d 890 (4th Cir. 2000)).  Citing Section 550 of the Restatement (Second) of Torts, Plaintiffs argue that when a party to a transaction conceals or intentionally prevents the other party from gaining access to material information, the concealing party is subject to the same liability for the pecuniary loss as though the party had stated the nonexistence of the matter.  Youndt v. First Nat'l Bank of Port Allegany, 868 A.2d 539, 549 (Pa. Super. Ct. 2005) (citing Restatement (Second) of Torts § 550).  More specifically, Plaintiffs assert that fraudulent concealment "is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter . . . the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact."  Gnagey Gas & Oil Co., Inc. v. Pennsylvania Underground Storage Tank Indemnification Fund, 82 A.3d 486, 500 (Pa. Commw. Ct. 2013).

Plaintiffs argue that Defendants committed fraudulent concealment by concealing material information to their principals at the time of the negotiation and execution of the Buddakan and Continental Amended Leases.  (Doc. No. 247-1 at 103-05, 125-26.)  Plaintiffs contend that had they known about Faggen's letter dated November 11, 2005, they would have

hesitated to continue negotiating with Defendants and the Buddakan and Continental Amended Leases would not have been signed.   (Id. at 103-05.)   But Plaintiffs were given accurate information at each juncture.   For instance, in his November 9, 2005 letter, Starr asked for a schedule of binding leases.   On December 16, 2005, Defendants responded to Starr's letter with a list of tenants who had either executed leases or negotiated leases.   The RumJungle and English is Italian leases were correctly listed as executed leases.   A few months later in an email exchange dated February 9, 2006, Peter Fine sent David Robkin a spreadsheet with a list of executed and negotiated leases.   Fine sent the spreadsheet because Robkin asked Fine earlier in the afternoon in his email "to provide Steve with a written update on the status of the other restaurants, i.e. permitting, construction and expected opening date."   (Ex. P-79.)   Correctly listed on the spreadsheet for each restaurant were the stage of negotiation and the progress being made.   Defendants provided the information requested as precisely as possible given the information available at the time.   Defendants did not conceal pertinent information from Plaintiffs when providing this information.

Defendants point out that it would have "been false to have omitted the RumJungle and English is Italian leases from the schedule provided to Plaintiffs because those leases had not been terminated and continued to be in effect."   (Doc. No. 248 at 4.)   But after Fine's response on February 9, 2006, Starr never questioned the representations on the spreadsheet or made further inquiries about the RumJungle or English is Italian leases, and no further details were required to be provided.[37]

---

[37] "It is axiomatic, of course, that silence cannot amount to fraud in the absence of a duty to speak."   Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 656 (W.D. Pa. 1999) (citing Drapeau v. Joy Tech., Inc., 670 A.2d 165, 171 (Pa. Super. Ct. 1996); Sevin v. Kelshaw, 611 A.2d 1232 (Pa. Super. Ct. 1992); Wilson v. Donegal Mut. Ins. Co., 598

Plaintiffs also argue unconvincingly that Defendants were under an obligation to disclose further material facts during their negotiations but instead concealed this information from Plaintiffs.[38]  Specifically, Plaintiffs allege that Defendants' failure to disclose more information about the RumJungle and English is Italian leases in the Faggen letter dated November 11, 2005 amounts to fraud by concealment.

A duty to speak arises where there is a confidential or fiduciary relationship between the parties.  Drapeau v. Joy Tech., Inc., 670 A.2d 165, 172 (Pa. Super. Ct. 1996) (citing Federal Land Bank of Baltimore v. Fetner, 410 A.2d 344 (Pa. Super. Ct. 1979)).  There was no confidential or fiduciary relationship between any Plaintiffs and any Defendants.  A standard business relationship does not create the existence of a fiduciary or confidential relationship, unless one party cedes a substantial amount of control over its affairs to another.  Drapeau, 670 A.2d at 172 (citing In re Scott's Estate, 316 A.2d 883 (Pa. 1974)).  The relationship here was that of two parties attempting to enter into a lease agreement, a developer and a potential tenant.  The record shows that the dealing was at arm's length.  Since the dealing was at arm's length and Defendants had no fiduciary or confidential relationship with Plaintiffs, Defendants were under

---

A.2d 1310 (Pa. Super. Ct. 1991); Smith v. Renaut, 564 A.2d 188 (Pa. Super. Ct. 1989). See also Restatement (Second) of Torts § 551 cmt. (". . . In the absence of a duty of disclosure, under the rule stated in Subsection (2) of this Section, one who is negotiating a business transaction is not liable in deceit because of his failure to disclose a fact that he knows his adversary would regard as material.")

[38] The Restatement (Second) of Torts § 551 states:

One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

Restatement (Second) of Torts § 551.

no obligation to disclose Faggen's letter dated November 11, 2005 regarding RumJungle and English is Italian to Plaintiffs.  Thus, Plaintiffs have not proven their claim of fraud based on the concealment of this letter.

### iv.   On Each Theory of Fraud, Plaintiffs Have Not Proven Defendants' Fraudulent Intent

Plaintiffs also have not proven Defendants had the requisite intent to commit fraud.  As noted, Defendants' "knowledge of the untrue character" of their representation is key to finding fraud.  <u>Ira G. Steffy & Son, Inc. v. Citizens Bank of PA</u>, 7 A.3d 278, 290 (Pa. Super. Ct. 2010) (citing Restatement (Second) of Torts § 526).

Plaintiffs failed to produce any evidence at trial to prove that Defendants had knowledge that RumJungle and English is Italian would not open at The Pier.  In fact, Peter Fine, Sheldon Gordon, and Scott Gordon all testified that they were continuously working with the Chodorow Organization to bring the two restaurants to The Pier.  Faggen's Letter, dated November 11, 2005, also supports this conclusion.  Defendants paid over $1 million in an attempt to procure the RumJungle and English is Italian leases, money they would not have invested into a failing project.  (Faggen Tr., 226:3-25, Oct. 26, 2015; Fine Tr., 76:6-18, Nov. 3, 2015.)  Thus, Plaintiffs have failed to show by clear and convincing evidence that Defendants acted with the required intent to commit fraud.

### v.   On Each Theory of Fraud, Plaintiffs Have Not Proven Their Justifiable Reliance

Plaintiffs also failed to prove by clear and convincing evidence justifiable reliance on Defendants' alleged misrepresentations.  Whether Plaintiffs' reliance on Defendants' alleged misrepresentations is justified depends on whether Plaintiffs "knew or should have known that the information supplied was false."  <u>Fort Washington Resources, Inc. v. Tannen</u>, 858 F. Supp.

455, 461 (E.D. Pa. 1994).  In deciding whether Plaintiffs' reliance on the information provided was justifiable, the Court should consider the degree of sophistication of the parties and the history of negotiations between them.  Greenberg v. Tomlin, 816 F. Supp. 1039, 1056 (E.D. Pa. 1993).

Plaintiffs have not proven justifiable reliance because, as noted, Defendants made no misrepresentations regarding RumJungle and English is Italian when Plaintiffs entered into the Amended Leases for the Buddakan and Continental restaurants at The Pier in Atlantic City. Moreover, Plaintiffs entered into the original leases prior to the execution of the RumJungle lease.  (Robkin Tr., 140:14-23, Oct. 27, 2015.)  Plaintiffs made no attempt to require the participation of RumJungle and English is Italian at The Pier in their Amended Leases, nor did Defendants make any misrepresentations regarding the participation of other potential restaurants.

Plaintiffs argue, for instance, that the parties' negotiations for a co-tenancy provision in the Amended Leases demonstrates that Plaintiffs justifiably relied on Defendants' representations that RumJungle and English is Italian would open at The Pier.  (Doc. No. 247-1 at 105-06.)  This argument is flawed for several reasons.  First, the purpose of the co-tenancy provision was to give tenants a rent reduction and a conditional right to terminate the leases in their entirety if a minimum number of tenants did not open for business at The Pier by a specified date.  It did not, as the Plaintiff contends, make the participation of RumJungle and English is Italian a requirement.  Second, during the co-tenancy provision negotiations, correspondence between Plaintiff and Defendant made no reference to either RumJungle or English is Italian.  (Exs. D-19-27.)  No provision of the Amended Leases, including the co-tenancy provision, mentions the opening of RumJungle or English is Italian as a specific

36

condition for Buddakan or Continental to open under the terms of the leases.  No document was submitted to support this notion.  Third, the co-tenancy provision could be satisfied with or without RumJungle or English is Italian opening at The Pier.[39]  Fourth, the co-tenancy provision demonstrates that Plaintiffs were willing to go forward with The Pier project so long as at least five (5) of the seven (7) additional restaurants participated in The Pier project or a certain percentage of retail tenants opened for business by December 31, 2006.  The negotiations over the co-tenancy provision, therefore, contradict Plaintiffs' position that they justifiably relied on Defendants' assurances about RumJungle and English is Italian.

---

[39] The provision merely required that a certain number of restaurants open in order to satisfy the requirements of the agreement.  The leases for both the Buddakan and Continental Restaurants provided in pertinent part:

> A new Section 24.24 is added to the Lease as follows: Section 24.24. Co-Tenancy.  In the event Tenant shall open for business prior to the date that at least five (5) of the seven (7) additional restaurants at the Center (to be occupied by Sonsie, Philips Seafood, English is Italian, Game On, Dubliner, RumJungle, and one additional restaurateur or by other restaurants of comparable quality) are open for business (the "Co-Tenancy"), and provided Tenant is not in default hereunder, Tenant shall pay to Landlord.  In lieu of Minimum Monthly Rent, Percentage Rent and any and all other charges or sums that are payable under this Lease . . .

> \*\*\*

> In the event (i) the Co-Tenancy is not satisfied and (ii) at least seventy-five (75%) of the rentable floor area of the Center to be occupied by other retail tenants is not open for business, by December 31, 2006, Tenant shall have the right to terminate this Lease upon written notice to the Landlord delivered no later than January 15, 2007.

(Ex. D-34 at 14.)  Six restaurants opened at The Pier: Sonsie, Phillips Seafood, Game On, Dubliner, Continental, and Buddakan.

**B.   Although Parol Evidence is Not Barred in this Case, Plaintiffs Still Have Not Proven Fraud**

Defendants argue that the parol evidence rule bars the admission of evidence relevant to Plaintiffs' fraud claim.  (Doc. No. 248 at 28.)  The Pennsylvania Supreme Court has described the parol evidence rule as follows:

> Where the parties, without fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.  All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004).  The Court continued by stating:

> Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract.

Id.   In Yocca, the Pennsylvania Supreme Court explained that the parol evidence rule traditionally bars evidence of previous oral or written statements that contradict the terms of the parties' written contract.  Id.  However, there is an exception to the parol evidence rule in cases where fraud is claimed.  Id.

In cases where fraud is averred, whether parol evidence is admissible depends on the nature of the alleged fraud.  Youndt v. First Nat'l Bank of Port Allegany, 868 A.2d 539, 546 (Pa. Super. Ct. 2005).  In Youndt, the Pennsylvania Superior Court found that an exception to the parol evidence rule applies in cases of "fraud in the execution."  Id.  In such cases, "the party proffering the evidence contends that he executed the agreements because he was defrauded by

38

being led to believe that the document contained terms that actually were omitted therefrom."
Id. (quoting Blumenstock v. Gibson, 811 A.2d 1029, 1037 (Pa. Super. Ct. 2002)).  Thus, "parol
evidence may be introduced to vary a writing meant to be the parties' entire contract where a
party avers that a term was omitted from the contract because of fraud."  Youndt, 868 A.2d at
546 (quoting Yocca, 854 A.2d at 437).

Another exception to the parol evidence rule applies in cases of "fraud in the
inducement."  Id.  In such a case, "the party proffering evidence of additional prior
representations does not contend that the representations were omitted from the written
agreement, but, rather, claims that the representations were fraudulently made and that 'but for
them' he would never have entered into the agreement."  Youndt, 868 A.2d at 546 (quoting
Blumenstock, 811 A.2d at 1036).  The theory is that "since fraud induced the agreement, no valid
agreement came into being and parol evidence is admissible to show that the alleged agreement
is void."  Id.

Nevertheless, in a case of fraud in the inducement, "a party cannot rely on prior oral
representations yet sign a contract denying the existence of those representations."  Blumenstock,
811 A.2d at 1036.  In such cases, the parol evidence rule will bar evidence of prior oral
statements where the contract contains terms that deny the existence of representations regarding
the subject matter of the alleged fraud.  Youndt, 868 A.2d at 546.

A contract with an integration clause has the effect of denying the existence of prior
representations.[40]  However, "when the contract contains no such term . . . parol evidence is
admissible to show fraud in the inducement."  Id.

_____

[40] An integration clause is "[a] contractual provision stating that the contract represents the
parties' complete and final agreement and supersedes all informal understandings and oral

The present case involves an allegation of fraud in the inducement.  Plaintiffs aver that they were induced to enter into the Amended Leases based on Defendants' "material misrepresentations, fraudulent concealments and fraudulent nondisclosures, relating to the status of the RumJungle and English is Italian projects at The Pier as Caesar's."  (Doc. No. 209-3 at 1-2.)  Plaintiffs do not seek to add to, subtract from, explain, or vary the terms of the Amended Leases.  (Id.)  Rather, Plaintiffs argue that they would not have entered into the Amended Leases but for Defendants' fraudulent misrepresentations and omissions regarding then-existing facts about RumJungle and English is Italian.  (Doc. No. 247-1 at 106.)

The original leases contain an integration clause that reads as follows:

> Section 24.3.  Entire Agreement
>
> There are no representations, covenants, warranties, promises, agreements, conditions or undertakings, oral or written, between Landlord and Tenant other than herein set forth.  Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing, signed by them and approved by Landlord's mortgagee.

(Doc. No. 147-1 at 33.)

The Amended Leases do not contain an integration clause similar to the clause in the original leases.  The Amended Leases, however, adopt the integration clause in the original leases by providing that "[e]xcept as herein modified, all of the other terms, covenants and conditions of the [original] Lease[s] shall remain in full force and effect."  (Doc. No. 147-7 at 4.)  But, in a related matter arising in the instant case, this Court (Robreno, J.) held that the integration clause as contained in the original leases, and as adopted in the Amended Leases, only applied to statements made before the original leases were signed, and not to statements

---

agreements relating to the subject matter of the contract."  Black's Law Dictionary 929 (10th ed. 2014).

made during the time period between the signing of the original leases and the Amended Leases.

Atlantic. Pier Assocs., LLC v. Boardakan Rest. Partners, 647 F. Supp. 2d 474, 493 (E.D. Pa.

2009).  Therefore, there is no integration clause that would bar reliance upon the statements and

omissions Plaintiffs rely upon in this case to show misrepresentations, since they occurred during

this intervening time period.  Id.  The Court explained its holding as follows:

> As the [Pennsylvania Superior Court in Giant Food Stores, LLC v. Silver Spring
> Development, L.P., 959 A.2d 438 (Pa. Super. Ct. 2008)], suggested, an
> integration clause is temporal in nature, and thus, the timing of its execution will
> necessarily limit its effect. Here, the integration clause contained in the original
> Leases indicates that on the date of execution of the Leases, "there [were] no
> representations, covenants, warranties, promises, agreements, conditions or
> undertakings, oral or written, between Landlord and Tenant other than set forth
> herein."  The incorporation of this term into the Amended Leases operates to
> preserve the original integration clause, and preclude evidence of oral or written
> communications which occurred prior to the execution of the original lease.
> However, mere incorporation of this term does not extend, ipso facto, the
> temporal reach of the integration clause to the time period between the execution
> of the original Leases to the execution of the Amended Leases.  Consequently,
> the Amended Leases do not contain a clause fully integrating the Leases during
> the time between the execution of the original Leases and the execution of the
> Amended Leases.

Id. (internal citation omitted).  This holding is the law of the case.[41]  Because the Amended

Leases do not contain a relevant integration clause, the parol evidence rule does not bar Plaintiffs

from introducing evidence of what they contend are the alleged prior misrepresentations and

omissions to prove fraud in the inducement.

But even considering the parol evidence to interpret the relationship or agreement

between the two parties, Plaintiffs have not proven by clear and convincing evidence that

---

[41] "The law of the case doctrine limits relitigation of an issue once it has been decided in an
earlier stage of the same litigation."  Hamilton v. Leavy, 322 F.3d 776, 786 (3d Cir. 2003).
"Law of the case rules apply to subsequent rulings by different judges in the same case."
Yucic v. Purdue Pharm., L.P., 343 F. Supp. 2d 386, 390 (M.D. Pa. 2004).  "The doctrine is
designed to protect traditional ideals such as finality, judicial economy and jurisprudential
integrity."  Id. (citing In re City of Phila. Litig., 158 F.3d 711, 717-18 (3d Cir. 1998)).

Defendants committed fraud.  As noted previously, there is no evidence that any negotiations, letters, or agreements show a misrepresentation by any Defendant.  Furthermore, Plaintiffs have not proven that Defendants withheld or published any false information that Plaintiffs reasonably relied upon before entering into the Buddakan or Continental Amended Leases.  Plaintiffs have been unable to satisfy their burden of proof to show that Defendants committed fraud, even with the parol evidence upon which they rely.  Plaintiffs therefore have failed to prove their Count I claims of fraud.

### C. Plaintiffs Have Not Met Their Burden of Proving Negligent Misrepresentation as Alleged in Count II

Plaintiffs' second claim is that if their claim for fraud fails, Defendants have at least committed negligent misrepresentation.  (Doc. No. 247-1 at 137.)  The Pennsylvania Supreme Court articulated the elements of negligent misrepresentation in Gibbs v. Ernst:

> (1) misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the misrepresentation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in a justifiable reliance on the misrepresentation.

647 A.2d 882, 890 (Pa. 1994).  Plaintiffs must prove all four elements set forth in Gibbs by a preponderance of the evidence to prevail on their negligent misrepresentation claim.  Weisblatt v. Minnesota Mut. Life Ins. Co., 4 F. Supp. 2d 371, 377 (E.D. Pa. 1998) (citing Gibbs, 647 A.2d at 890).  Negligent misrepresentation claims are substantially similar to claims alleging fraud.[42]

---

[42]  Pennsylvania courts apply the definition of negligent misrepresentation set forth in the Restatement (Second) of Torts § 552:

> (1)  One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for

Both require the defendant to make a material misrepresentation of fact, that plaintiff justifiably relied on defendant's misrepresentation, and that plaintiff suffered harm as a direct result of this reliance.   For example, both a negligent misrepresentation claim and a fraudulent misrepresentation claim require "an actual misrepresentation as opposed to assumptions on the part of the [plaintiff]."   See Partners Coffee Co. v. Oceana Services and Products Co., 700 F. Supp. 2d 720, 733 (W.D. Pa. 2010) (citing Kramer v. Dunn, 749 A.2d 984, 991 (Pa. Super. Ct. 2000)).   The main difference, however, is the state of mind of the defendant.   Compare Little v. York County Earned Income Tax, 481 A.2d 1194, 1199 (Pa. 1985) (explaining that negligent misrepresentation is the failure to exercise reasonable care in communicating false information), with Linda Coal & Supply Co. v. Tasa Coal Co., 204 A.2d 451, 453 (Pa. 1964) (noting that fraudulent misrepresentation requires that a false statement or omission be knowingly made or omitted).   In essence, a negligent misrepresentation occurs when a defendant makes a false statement with a lack of reasonable care or competence in obtaining or communicating information.   Woodward v. Dietrich, 548 A.2d 301, 308-09 (Pa. Super. Ct. 1988).

---

pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2)  Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

a.  By the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

b. Through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Plaintiffs here have not proven negligent misrepresentation. Like their fraud claims, Plaintiffs have failed to show that Defendants made a misrepresentation of a material fact. Defendants gave accurate depictions of the status of the RumJungle and English is Italian leases whenever the Starr Organization requested information on the status of the leases. Plaintiffs' assumption that RumJungle and English is Italian would open at The Pier, without more, does not prove negligent misrepresentation. Every representation made by Defendants, at every juncture critical to Plaintiffs' claims, show that Defendants' believed in good faith that both RumJungle and English is Italian would open. The representations were true at the time they were made. Thus, Plaintiffs have not proven their claim of negligent misrepresentation.

Finally, under § 552 of the Restatement (Second) of Torts, negligent misrepresentation claims are limited to situations where the defendants accept the role of advisor and provide guidance to the plaintiff.[43] As the Court noted before, the parties in this litigation were merely parties to a contract. Both the negotiation and the execution of the leases were conducted at an arm's length. Since the deal was an arm's length transaction, § 552 does not afford Plaintiffs relief. Therefore, Plaintiffs' negligent misrepresentation claim is without merit. For that reason, Plaintiffs have failed to prove their Count II claim for negligent misrepresentation.

---

[43] In <u>Bilt-Rite Contractors, Inc. v. The Architectural Studio</u>, the court drew a distinction with respect to § 552, stating that:

> The tort is narrowly tailored, as it applies only to those businesses which provide services and/or information that they know will be relied upon by third parties in their business endeavors, and it includes a foreseeability requirement, thereby reasonably restricting the class of potential plaintiffs. . . .

> Section 552 is not radical or revolutionary; reflecting modern business realities, it merely recognizes that it is reasonable to hold such professionals to a traditional duty of care for foreseeable harm.

866 A.2d 270, 286 (Pa. 2005) (discussing Restatement (Second) of Torts § 552).

44

### D. Plaintiffs Have Not Met Their Burden of Proving Promissory Estoppel as Alleged in Count IV

Plaintiffs' final claim is that, if their fraud and negligent misrepresentation claims fail, promissory estoppel requires a finding in their favor.  (Doc. No. 247-1 at 138.)  The elements of promissory estoppel under Pennsylvania law are: (1) a promise to a promisee, (2) which the promisor should reasonably expect will induce action by the promisee, (3) which does induce action, and (4) which should be enforced to prevent injustice to the promisee.  C&K Petroleum Products, Inc. v. Equibank, 839 F.2d 188, 191 (3d Cir. 1988) (citing Thomas v. Seaman, 304 A.2d 134, 137 (Pa. 1973)).  These elements must be proven by clear and convincing evidence. Luther v. Kia Motors America, Inc., 676 F. Supp. 2d 408, 421 (W.D. Pa. 2009).  As noted above, Plaintiffs did not reasonably rely on any false promise by Defendants.  The Starr Organization was given accurate information when it was requested.  Moreover, no injustice has been done to the promisee Plaintiffs.  For these reasons, the promissory estoppel claim has no merit.  As a result, Plaintiffs have failed to prove their Count IV claim of promissory estoppel.

## IV.   DAMAGES

Because the Court is unable to find wrongdoing by Defendants, Plaintiffs are not entitled to damages, including their request for rescission and punitive damages.[44]  (Doc. No. 247-1 at 138, 142.)

## V.   CONCLUSION

For the foregoing reasons, the Court will award judgment in favor of Defendants Gordon Group Holdings, LLC, Pier Developers, LLC, Peter J. Fine, Sheldon Gordon, and Scott Gordon,

---

[44] Rescission is an equitable remedy, to be granted only where the parties to a contract can be placed in their former positions with regard to the subject matter of the contract.  Rescission attempts to make each party whole again.  Baker v. Cambridge Chase, Inc., 725 A.2d 757, 766 (Pa. Super. Ct. 1999).

and against Plaintiffs Boardakan Restaurant, LLC and Oceanental Restaurant, LLC, on Count I—Fraudulent Inducement Based on Misrepresentation, Nondisclosure, and Concealment; Count II—Negligent Misrepresentation; Count IV—Promissory Estoppel; and Count V—Alter Ego. (Doc. No. 147.)

An Appropriate Order follows.